ROLANDO A. SILVA, CALIXTO CALERO JUARBE, MERCEDES TORRES VDA. DE PÉREZ, demandantes y recurridos, *v.* MIGUEL HERNÁNDEZ AGOSTO, PRESIDENTE DEL SENADO DE PUERTO RICO, demandado y recurrente.

*Número:* R-84-522 *Resuelto:* 15 de diciembre de 1986

———

48

50

*Marcos A. Ramírez Lavandero,* de *Ramírez & Ramírez,* abogado de los recurrentes; *Héctor Urgell Cuebas,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

En el presente caso nos confrontamos con una controversia de gran importancia. Bajo nuestra Constitución, ¿puede una comisión del Senado constituirse en sesión ejecutiva y descargar sus funciones y poderes con exclusión de los miembros que representan las minorías parlamentarias en el comité? Resolvemos en la negativa.

I

LOS HECHOS

El 23 de febrero de 1981 el Senado de Puerto Rico aprobó la Resolución Núm. 91 que ordena a la Comisión de lo Jurídico del Senado investigar lo ocurrido en el Cerro Maravilla el 25 de julio de 1978, sus antecedentes y actos posteriores realizados por funcionarios públicos y gubernamentales. Véanse: *Peña Clos* v. *Cartagena Ortiz,* 114 D.P.R. 576 (1983); *Soto* v. *Srio. de Justicia,* 112 D.P.R. 477 (1982). El 28 de mayo de 1981 dicha Comisión aprobó el Reglamento para Regir la Investigación sobre los Sucesos del Cerro Maravilla. Posterior-

mente la Comisión enmendó este reglamento y le incorporó la Regla 7.1 que dispone: (¹)

> Cuando el Investigador determine que la confidencialidad de un testimonio es necesaria para los propósitos de la investigación, se lo comunicará así al Presidente de la Comisión. En caso de que el Presidente coincida con la recomendación del Investigador, *el testimonio confidencial se presentará en Sesión Ejecutiva sólo ante el Presidente de la Comisión y el Investigador y ante las personas que el Presidente determine que son esenciales para poder tomar dicho testimonio.*
>
> Cuando el Presidente determine que sin perjudicar los propósitos de la investigación, el testimonio puede ser sometido a la Comisión en pleno, debe haberse cumplido con lo dispuesto en la Regla 6D de este Reglamento, la cual se hará ante el Presidente de la Comisión.
>
> A la terminación de la Sesión Ejecutiva, en la cual se presente a la totalidad de la Comisión el testimonio confidencial, se hará público dicho testimonio. (Énfasis suplido y escolios omitidos.)

El 30 de agosto de 1984 los Sres. Rolando A. Silva, Calixto Calero Juarbe y la Sra. Mercedes Torres Vda. de Pérez, en calidad de miembros de la Comisión de lo Jurídico del Senado en representación de la minoría electa por el Partido Nuevo Progresista, impugnaron judicialmente la validez constitucional de la transcrita Regla 7.1. Incluyeron como demanda-

---

(¹) Hasta esa fecha autorizaba a su Presidente, de entenderlo necesario, a recibir testimonios en una sesión ejecutiva en presencia sólo de los *miembros de la Comisión*, el equipo técnico, el abogado del testigo y "cualquier otra persona cuya presencia la Comisión entienda necesaria". Bajo esta disposición la Comisión laboró con éxito por espacio de más de dos años.

El 22 de noviembre de 1983 los senadores Oreste Ramos y Efraín Santiago, miembros de la minoría en la Comisión, alegadamente violaron las reglas de confidencialidad de ésta al informar al entonces Gobernador, Lic. Carlos Romero Barceló, el contenido de los testimonios confidenciales vertidos por dos testigos en sesión ejecutiva. Como consecuencia de dicha violación fueron expulsados de la Comisión.

Alega el Senado que como resultado directo de este incidente se enmendó en 1984 la Regla 7.1 para "fortalecer aún más el procedimiento" investigativo de la Comisión.

dos al Presidente del Senado, Sr. Miguel Hernández Agosto, al Presidente de la Comisión de lo Jurídico del Senado, Lic. Francisco Aponte Pérez, y a los Sres. Hipólito Marcano y Carlos Tosca González, Secretario y Sargento de Armas del Senado, respectivamente. Alegaron, en esencia, que los demandados al poner en vigor la Regla 7.1 los habían excluido de unas reuniones de la Comisión convocadas para escuchar los testimonios de varias personas citadas bajo las disposiciones del Código Político. Alegaron que esta actuación inconstitucional impidió que ellos ejercieran sus facultades legislativas y privó a los electores que votaron por ellos de una representación efectiva en los trabajos y deliberaciones de la Comisión.

El 5 de octubre de 1984 el Tribunal Superior, Sala de San Juan, desestimó la causa de acción contra los senadores demandados en virtud de la cláusula constitucional sobre inmunidad parlamentaria. Retuvo jurisdicción sobre los señores Marcano y Tosca. Decretó que la Regla 7.1 era inconstitucional y ordenó al Secretario y al Sargento de Armas del Senado que cesaran y desistieran de ponerla en vigor.

A solicitud del Senado acordamos revisar. ([2])

---

([2]) Aunque ninguna de las partes lo ha planteado, los resultados eleccionarios de 1984 no han tornado el recurso académico. *Com. de la Mujer* v. *Srio. de Justicia,* 109 D.P.R. 715, 725 (1980). El demandante, Sr. Rolando Silva, fue reelecto en las elecciones de 1984 a su cargo como senador y continúa desempeñándose hasta el presente. Los otros demandantes no fueron reelectos.

El 2 de abril de 1985 fue aprobada por el Senado de Puerto Rico la Resolución del Senado Núm. 31 de la Décima Asamblea Legislativa. Ordenó a la Comisión de lo Jurídico que continúe con la investigación. El 26 de febrero de 1986 el Senado compareció ante este foro mediante moción para informarnos que el 24 de octubre de 1985 la Comisión de lo Jurídico aprobó su Reglamento para Regir la Investigación sobre los Sucesos del Cerro Maravilla, "incorporando la misma Regla 7.1 cuya constitucionalidad está en controversia en el recurso de revisión de autos".

Por otro lado, la validez de la Regla 7.1 también es importante para la solución del recurso instado en *Hernández Agosto* v. *Betancourt,* 118 D.P.R. 79 (1986).

No hay dudas de que estamos frente a una controversia real entre las partes. *E.L.A.* v. *Aguayo,* 80 D.P.R. 552 (1958).

## II

J USTICIABILIDAD

### A. La doctrina de cuestión política

El Senado argumenta, en primer lugar, que tanto el tribunal a quo como esta curia están impedidos de intervenir en la presente controversia por ésta no ser justiciable. Aduce que se trata de una cuestión política.

Antes de discutir las cuestiones envueltas, es menester aclarar el marco decisional. No estamos frente a un caso en que se cuestionan los poderes investigativos del Senado, o el poder de regir sus procedimientos internos, o de establecer normas sobre quórum, o de sancionar a sus miembros, o de celebrar sesiones confidenciales. Nuestra intervención se limita a determinar si por reglamento se pueden delegar al presidente de una comisión los poderes para excluir a los miembros de la minoría de una sesión ejecutiva constituida para cumplir con las obligaciones del cuerpo al amparo de los poderes conferidos por la Constitución y las leyes de Puerto Rico.

En Estados Unidos la doctrina de que algunas controversias no son justiciables por plantear asuntos políticos tiene un origen antiguo. *Luther* v. *Borden et al.*, 48 U.S. 1 (1849). Véanse: L. Tribe, *American Constitutional Law*, Nueva York Fundation Press, 1978, págs. 71–79; J. Nowak, R. Rotunda y J. Young, *Constitutional Law*, 2da ed., Minnesota, West Pub. Co., 1984, págs. 109–120. Sin embargo, tanto el contenido como la aplicación de este concepto por los tribunales ha generado un intenso debate entre los estudiosos del poder judicial federal. G. Gunther, *Cases and Materials on Constitutional Law*, 11ma ed., Nueva York, Foundation Press, 1985, págs. 396–402, 1608–1615; L. Henkin, *Is There a "Political Question" Doctrine?*, 85 Yale L.J. 597 (1976); M. Redish, *Judicial Review and the "Political Question"*, 79 N.W.U.L. Rev. 1031 (1984). Aunque hay diferencias sobre los ingredientes de la fórmula, hay un consenso de que los tribunales no la han

aplicado consistentemente y esto ha causado incertidumbre y confusión. Tribe, *op. cit.*

No fue hasta *Baker* v. *Carr*, 369 U.S. 186, 217 (1962), que el Tribunal Supremo federal estableció los criterios generales para determinar la aplicabilidad de la doctrina de cuestión política. Requirió que exista uno de los siguientes elementos: (1) una delegación expresa del asunto en controversia a otra rama del gobierno; (2) la ausencia de criterios o normas judiciales apropiadas para resolver la controversia; (3) la imposibilidad de decidir sin hacer una determinación inicial de política pública que no le corresponde a los tribunales; (4) la imposibilidad de tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno; (5) una necesidad poco usual de adherirse, sin cuestionar, a una decisión política tomada previamente, y (6) potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos del Gobierno sobre un punto. Véanse: *Powell* v. *McCormack*, 395 U.S. 486 (1969); *Gilligan* v. *Morgan*, 413 U.S. 1 (1973); *United States* v. *Nixon*, 418 U.S. 683 (1974); *Goldwater* v. *Carter*, 444 U.S. 996 (1979); *Crockett* v. *Reagan*, 720 F.2d 1355 (1983).

En Puerto Rico la doctrina de cuestión política no ha tenido el mismo arraigo que en Estados Unidos. En *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750 (1977), al interpretar el poder de exclusión de la Sec. 9 del Art. III de la Constitución concluimos que "los cuerpos legislativos no pueden convertirse en los jueces constitucionales de sus propios poderes. Es a los tribunales a quienes les toca interpretar las leyes y la Constitución". En esa ocasión al examinar la justiciabilidad de la controversia reiteramos los pronunciamientos del Tribunal Supremo federal en *Baker* v. *Carr*, supra, pág. 209: "El mero hecho que el pleito busca la protección de un derecho político no quiere decir que el mismo presenta una cuestión política." (Traducción nuestra.)

■ En todas las ocasiones anteriores ante reclamos de cuestión política hemos reafirmado el poder de los tribunales de ser los intérpretes finales de los contornos de la Constitución y para determinar si los actos de una rama de gobierno exceden su autoridad constitucional. *Marbury* v. *Madison*, 1 Cranch 137 (1803); *Santa Aponte* v. *Srio. del Senado*, supra. La interpretación inicial que de la Constitución haga otra rama merece deferencia, pero debe prevalecer la norma de que la determinación final corresponde a los tribunales. *United States* v. *Nixon*, supra. Nuestra estructura de gobierno no permite que las ramas políticas del Gobierno se conviertan en árbitros de sus propios actos. Véanse: *The Supreme Court, 1968 Term.*, 83 Harv. L. Rev. 62, 68 (1969); H. Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 Harv. L. Rev. 1 (1959); Henkins, *op. cit.;* Redish, *op. cit.;* Tribe, *op. cit.;* Nowak, Rotunda y Young, *op. cit.;* A. Bickel, *The Least Dangerous Branch*, 2da ed., Connecticut, Yale U. Press, 1986, págs. 183–198.

En el presente caso el Senado alega que la controversia no es justiciable porque se cumple con tres de los criterios esbozados en *Baker* v. *Carr*, supra. En primer lugar, alega que estamos ante una materia expresamente delegada a la Asamblea Legislativa: la facultad de adoptar reglas internas.

■ Desde hace siglos se ha aceptado que los cuerpos legislativos pueden adoptar reglas de gobierno interno, como corolario del poder inherente de controlar sus procedimientos. L. S. Cushing, *Elements of the Law and Practice of Legislative Assemblies in the United States of America*, Nueva Jersey, Rothman Reprints, 1971, págs. 247, 311–312. El *Acta Foraker*, Sec. 3 (31 Stat. 83), y el *Acta Jones*, Art. 32 (39 Stat. 960), invistieron a nuestras instituciones legislativas con la autoridad para regir sus procedimientos internos. *De Diego et al.* v. *La Cámara, Etc.*, 5 D.P.R. 114 (1904). En 1952 nuestra Constitución incorporó de manera clara y ex-

presa la facultad de las Cámaras de Puerto Rico para adoptar "las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno". Art. III, Sec. 9. Nuestra Asamblea Legislativa, así como la Cámara de Representantes y el Senado de Estados Unidos, han autorizado a sus comisiones a adoptar reglas para su gobierno interno que no estén en contradicción con las reglas generales de cada cuerpo. [3]

Sin embargo, es doctrina firmemente establecida que al ejercer su función de reglamentar, la Asamblea Legislativa y las comisiones no pueden obviar e ignorar las limitaciones constitucionales. El Tribunal Supremo federal en *United States* v. *Ballin*, 144 U.S. 1, 5 (1892), examinó la validez de una regla del Congreso y concluyó:

> Ante la Corte la controversia es una sólo de poder. La Constitución faculta a cada cámara a determinar sus reglas de procedimiento. No pueden mediante sus reglas ignorar limitaciones constitucionales o violar derechos fundamentales . . . . (Traducción nuestra.)

Véanse: *United States* v. *Smith*, 286 U.S. 6 (1932); *Yellin* v. *United States*, 374 U.S. 109, 114 (1963); *Kilbourn* v. *Thompson*, 103 U.S. 168, 199 (1880).

En segundo lugar, alega el Senado que al presente no existen criterios o normas judiciales para resolver la controversia. Tampoco le asiste la razón. El planteamiento central de los recurridos es que al poner en vigor la Regla 7.1 para la Investigación sobre los Sucesos del Cerro Maravilla se violan sus derechos constitucionales y a través de esto se afecta la eficacia del voto de sus representados.

---

[3] Véanse: Regla XIV(1), Reglamento del Senado de P.R.; Regla XIII(1), Reglamento de la Cámara de Representantes de P.R., 1982; Rule XI2(a)(2), Rules of the House of Representatives of the United States of America, Ninety-Eighth Congress, 1983.

El Art. III de nuestra Constitución, así como el Art. II, Sec. 2 y el Preámbulo están predicados en la existencia de un gobierno democrático y representativo. Las Secs. 14 y 17 del Art. III de la Constitución hacen referencia directa a la existencia de las comisiones legislativas. Es función ineludible de los tribunales interpretar la Constitución y velar que el espíritu y el esquema democrático de esta Carta no se vulnere. *Fuster* v. *Busó,* 102 D.P.R. 327 (1974) ; *García Passalacqua* v. *Tribunal Electoral,* 105 D.P.R. 49 (1976) ; *Santa Aponte* v. *Srio. del Senado,* supra; *Vélez Ramírez* v. *Romero Barceló,* 112 D.P.R. 716, 731–734 (1982).

Por último, señala el Senado que la controversia constituye una cuestión política porque cualquier intervención sería una falta de respeto y deferencia a la Asamblea Legislativa. La teoría de la separación de poderes requiere que las facultades delegadas por el pueblo en la Carta Constitutiva se distribuyan entre las tres ramas. Su premisa es evitar la concentración de poderes en una sola. La relación entre los poderes del Gobierno debe ser dinámica y armoniosa. Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Su perdurabilidad requiere que cuando haya conflicto sobre el alcance de los poderes constitucionales de cualquiera de ellas, los tribunales intervengan con prudencia y deferencia para aclarar los contornos de la Constitución y facilitar la resolución de las diferencias.

En este contexto, determinar las normas constitucionales mínimas que deben regir el funcionamiento de las comisiones no constituye una indebida intromisión en los trabajos de la Rama Legislativa. Los senadores de la minoría han acudido a los tribunales para que resolvamos este problema. La determinación final de esta controversia es un asunto para el cual los tribunales estamos preparados y tenemos la expe-

riencia y autoridad constitucional para tomar una decisión que responda a las circunstancias históricas de nuestro país.

## B. La doctrina de inmunidad parlamentaria

■ Alegan los recurrentes que el tribunal a quo incidió al declarar inconstitucional la Regla 7.1 y dictar un *injunction* contra el Secretario y el Sargento de Armas del Senado de Puerto Rico porque están protegidos por la inmunidad parlamentaria garantizada por el Art. III, Sec. 14 de la Constitución del Estado Libre Asociado. [4] Nuestra Cláusula de Inmunidad Parlamentaria fue adoptada basada en la experiencia norteamericana y en la disposición similar contenida en la Constitución de Estados Unidos. Art. I, Sec. 6.

Por esta razón a manera de ilustración en casos como el de autos es conveniente estudiar la experiencia norteamericana. [5] En Estados Unidos esta disposición, de origen británico, ha sido interpretada extensamente por el Tribunal Supremo federal. *Kilbourn* v. *Thompson*, supra; *Tenney* v. *Brandhove*, 341 U.S. 367 (1951); *United States* v. *Johnson*, 383 U.S. 169 (1966); *Dombrowski* v. *Eastland*, 387 U.S. 82 (1967); *Powell* v. *McCormack*, supra, pág. 486; *United States* v. *Brewster*, 408 U.S. 501 (1972); *Gravel* v. *United States*,

---

[4] ". . . [T]odo miembro de la Asamblea Legislativa gozará de inmunidad parlamentaria por sus votos y expresiones en una u otra cámara o en cualquiera de sus comisiones". Art. III, Sec. 14, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, págs. 342-343.

[5] Para un análisis de la cláusula federal véanse: R. Reinstein y H. Silverglate, *Legislative Privilege and the Separation of Powers*, 86 Harv. L. Rev. 1113 (1973); X. L. Suárez, *Congressional Immunity: A Criticism of Existing Distinctions and a Proposal for a New Definitional Approach*, 20 Vill. L. Rev. 97 (1974); L. Yankwich, *The Immunity of Congressional Speech—Its Origin, Meaning and Scope*, 99 U. Pa. L. Rev. 960 (1951); A. Cella, *The Doctrine of Legislative Privilege of Speech or Debate: The New Interpretation as a Threat to Legislative Coequality*, 8 Suffolk U. L. Rev. 1019 (1974). En Puerto Rico véanse: A. Acevedo, *La Cláusula de Inmunidad Parlamentaria y la función informativa de la Asamblea Legislativa*, 54 Rev. Jur. U.P.R. 661 (1985); Melecio, *Estudio sobre Inmunidad Parlamentaria*, Oficina de Servicios Legislativos (1982).

408 U.S. 606 (1972) ; *Doe* v. *McMillan,* 412 U.S. 306 (1973) ; *Eastland* v. *United States Servicemen's Fund,* 421 U.S. 491 (1975) ; *Lake Country Estates* v. *Tahoe Planning Agcy.,* 440 U.S. 391 (1979) ; *United States* v. *Helstoski,* 442 U.S. 477 (1979) ; *Hutchinson* v. *Proxmire,* 443 U.S. 111 (1979). En Puerto Rico en pocas ocasiones hemos tenido la oportunidad de examinar su dimensión. *Vélez Ramírez* v. *Colberg Ramírez,* 117 D.P.R. 873 (1986) ; *Santa Aponte* v. *Srio. del Senado,* supra; *In re Rodríguez Torres,* 106 D.P.R. 698 (1978) ; *Romero Barceló* v. *Hernández Agosto,* 115 D.P.R. 368 (1984). (6)

El propósito de la inmunidad parlamentaria desde sus orígenes no ha sido "impedir la revisión judicial de las actuaciones legislativas", *Powell* v. *McCormack,* supra, pág. 505, sino proteger a la Rama Legislativa de intervenciones indebidas de la Rama Ejecutiva o de la Rama Judicial y permitirle a los legisladores laborar libremente en el hemiciclo sin temor a ser demandados por sus actuaciones oficiales. *Romero Barceló* v. *Hernández Agosto,* supra; Reinstein y Silverglate, *op. cit.,* pág. 1119; A. Acevedo, *La Cláusula de Inmunidad Parlamentaria y la función informativa de la Asamblea Legislativa,* 54 Rev. Jur. U.P.R. 661 (1985). Aunque el eje de la protección es la discusión en el hemiciclo, *Gravel* v. *United States,* supra, pág. 625, su cobertura abarca más que sus expresiones en el debate parlamentario, *Kilbourn* v. *Thompson,* supra, pág. 204. Cobija todas aquellas actividades que forman parte

---

(6) En *Romero Barceló* v. *Hernández Agosto,* 115 D.P.R. 368 (1984), extendimos la protección constitucional al ejercicio por parte de la Asamblea Legislativa de la función de informar al pueblo. Resolvimos que en Puerto Rico "son actividades legislativas legítimas, además de la de formular las leyes, la de investigar y fiscalizar el Gobierno, la de debatir asuntos de interés público y la de mantener informado al pueblo sobre la marcha de la cosa pública. Estas funciones, por definición, están protegidas por la doctrina de la inmunidad parlamentaria". Véanse: Acevedo, *op. cit.; Romero Barceló* v. *Hernández Agosto,* supra, pág. 379.

integrante del proceso legislativo. Lo determinante es la naturaleza del acto y su relación con el proceso deliberativo y de votación inherente a las funciones parlamentarias.

■ Alega el Senado que en este caso no procede la demanda porque la inmunidad protege tanto a los senadores como al Secretario y al Sargento de Armas también. Desde *Kilbourn* v. *Thompson*, supra, el Tribunal Supremo federal ha distinguido entre lo que es un acto legislativo y una acción no legislativa para propósitos del alcance de la Cláusula de Inmunidad. Véanse: *Dombrowski* v. *Eastland*, supra, y *Powell* v. *McCormack*, supra. Criterio similar adoptamos en *Santa Aponte* v. *Srio. del Senado*, supra. La autorización por la Asamblea Legislativa de una orden inconstitucional no inmuniza a aquellos que la ponen en vigor. *Kilbourn* v. *Thompson*, supra; *Dombrowski* v. *Eastland*, supra; *Powell* v. *McCormack*, supra, reafirmados en *Gravel* v. *United States*, supra, pág. 620.

■ Para estar protegida, la actuación del funcionario legislativo tiene que ser parte integral del proceso legislativo. *Gravel* v. *United States*, supra, pág. 629. Es necesario que el acto realizado por el ayudante hubiese estado inmune, de haberlo realizado el propio legislador. Ibíd., pág. 618. Lo importante es el acto, no quién lo lleve a cabo.

En el presente caso los senadores de la minoría parlamentaria no impugnan la decisión de los legisladores de aprobar la Regla 7.1 ni su motivación. Aquí lo que se cuestiona son las actuaciones del Sargento de Armas y del Secretario del Senado al poner en vigor esta regla.

■ Ambos funcionarios, el Secretario y el Sargento de Armas, intervienen en la implantación reglamentaria "autorizada" por la Regla 7.1. Mientras que el Secretario tiene el deber de notificar las fechas de las reuniones de las comisiones, Regla XIV (1) (1) del Reglamento del Senado, el Sargento

de Armas es quien diligencia las citaciones a los testigos, Regla XIV (1) (6) de este reglamento. Además, es el Sargento de Armas quien tiene la responsabilidad de poner en vigor las órdenes del Presidente de la Comisión de impedir a los demandantes entrar a las reuniones citadas al amparo de la Regla 7.1, Regla VI del Reglamento del Senado. Véase N. Rigual, *El Poder Legislativo de Puerto Rico*, Río Piedras, Ed. U.P.R., 1961, págs. 31–34. La acción contra ellos procede en derecho. *Powell* v. *McCormack*, supra; *Santa Aponte* v. *Srio. del Senado*, supra.

 Para que esta actuación esté cobijada bajo la protección de la inmunidad parlamentaria hay que examinar no solamente si la misma es parte integrante de actividades legislativas legítimas, pero también hay que interpretar si cumple con los parámetros constitucionales. Esta es una función que le corresponde a los tribunales y es un asunto justiciable.

Una vez hemos concluido que el asunto es justiciable y que la Cláusula de Inmunidad Parlamentaria no protege a los funcionarios legislativos cuando ponen en vigor la Regla 7.1, procede que estudiemos la función de las comisiones en la Asamblea Legislativa de Puerto Rico. Antes de examinar esto es conveniente un repaso del desarrollo histórico de los comités congresionales en Estados Unidos y de la jurisprudencia aplicable que pueda ser utilizada como ilustración. Allá se originó el esquema legislativo que prevalece en nuestro sistema constitucional.

### III

LAS COMISIONES LEGISLATIVAS

*A. Las comisiones en el Congreso de Estados Unidos*

Desde sus orígenes el Congreso de Estados Unidos ha utilizado el mecanismo de las comisiones legislativas (*congres-*

*sional committees*) para que le asistan en el desempeño de sus deberes. Bolling, *Committees in the House*, en *Changing Congress: The Committee System*, 411 Annals 1, 2 (1974); W. Keefe y M. Ogul, *The American Legislative Process*, 4ta ed., Prentice Hall, 1977, pág. 163. Los primeros comités creados por el Congreso fueron comisiones especiales (*select committees*), cuyas funciones, vida y marco de acción eran muy limitadas. Kravitz, *Evolution of the Senate Committee System*, en *Changing Congress, op. cit.*, págs. 28–29. A mediados del siglo XIX las comisiones especiales fueron sustituidas por unas permanentes (*standing committees*). Ibíd. Para finales del siglo XIX el poder y la importancia de los comités permanentes era evidente. W. Wilson, *Congressional Government; A Study in American Politics*, Nueva York, Ed. Meridian, 1956, pág. 56.

Durante el presente siglo las comisiones legislativas han adquirido prestigio y mucha importancia en todo el proceso legislativo por varias razones: (1) la ampliación de la participación del Estado en la vida diaria de la sociedad moderna se ha traducido en un incremento en el trabajo parlamentario y en la necesidad de distribuirlo eficientemente; (2) la naturaleza y complejidad de los asuntos requieren más especialización de los legisladores. Francis, *Legislative Committees System, Optional Committee Size and the Cost of Decision Making*, 44 J. Pol. 822 (1982).[7] A través de su estructura operacional las comisiones han facilitado que el Congreso fiscalice eficientemente a la Rama Ejecutiva, han agilizado el flujo de ideas provenientes de la comunidad, y han promovido el proceso de negociación interna. En el último siglo, de meros entes de ayuda técnica se han convertido en organismos donde se

---

[7] En el Congreso existen varios tipos de comisiones: (1) comités permanentes (*standing committees*); (2) comités conjuntos (*joint committees*); (3) comités especiales (*select or special committees*), y (4) comité de la Cámara en pleno (*committee of the Whole House*). Véase C. Ramos de Santiago, *El Gobierno de Puerto Rico*, Río Piedras, Ed. Universitaria, 1979, págs. 573–574.

genera política pública. Keefe y Ogul, *op. cit.*, págs. 157–159; Bolling, *op. cit.;* Brock, *Committee in the Senate,* en *Changing Congress, op. cit.*, pág. 16; Kravitz, *op. cit.*, pág. 30; Davidson, *Representation and Congressional Committees,* en *Changing Congress, op. cit.*, pág. 49; M. Jewell y S. Patterson, *The Legislative Process in the United States,* Nueva York, Random House, 1966, págs. 202–230. [8]

Los poderes de las comisiones congresionales emanan de las facultades inherentes del Congreso y ejercitan sus prerrogativas por delegación expresa de éste. Aunque el partido de mayoría controla todas las comisiones, la minoría tiene derecho a participar en sus trabajos y en las deliberaciones. [9]

Concluido este recuento de la evolución de los comités del Congreso, procede el examen de su incorporación y desarrollo en nuestro país.

## B. *Las comisiones legislativas en Puerto Rico hasta 1952*

En Puerto Rico la historia de las comisiones legislativas se remonta a principios de siglo. Desde su creación en 1900 la Cámara de Delegados puertorriqueña, único cuerpo represen-

---

[8] La literatura reciente sobre la influencia de los comités congresionales y su comportamiento es muy amplia. Además de los trabajos previamente citados, véanse: Parker y Parker, *Factions in Committee: The U.S. House of Representatives,* 73 Am. Pol. Sci. Rev. 85 (1979); Cavanagh, *The Dispersion of Authority in the House of Representatives,* 97 Pol. Sci. Q. 623 (1982–1983). Sobre el desarrollo en el uso de subcomités véase Haeberle, *The Institutionalization of the Subcommittee in the United States House of Representatives,* 40 J. Pol. 1054 (1978).

[9] En la Cámara de Representantes del Congreso federal se reconoce hoy día, inclusive, el derecho de todos los miembros del cuerpo a estar presentes en una vista de una comisión a menos que el cuerpo como tal prohíba la entrada de los no miembros. Regla XI, cl. 2(g)(1) y (2), Reglamento de la Cámara de Representantes, 1981; *Jefferson's Manual,* Sec. 410. La Regla XI cl. 2(j)(1) le reconoce a las minorías el derecho a presentar testigos en las vistas que celebre una comisión.

tativo electo bajo la Ley Foraker, ([10]) utilizó comités para distribuir su trabajo legislativo. ([11])

En 1917 la Ley Jones en su Art. 34 incorporó el requisito de que cada proyecto de ley se remitiese a una comisión antes de ser considerado por el cuerpo. El primer Senado puertorriqueño, constituido en 1917 al amparo de la Ley Jones contaba con nueve (9) comisiones permanentes. Reglamento del Senado de Puerto Rico, 1917, Regla VIII (1).

Desde sus orígenes el Senado de Puerto Rico ha permitido a las minorías parlamentarias tener representación en todas las comisiones. La Regla VIII (7) de 1917 disponía que "[l]os informes de comisiones serán firmados por los presidentes y secretarios de las mismas. En caso de que algunos de sus miembros *en minoría* estuvieren ausentes o fuesen contrarios al dictamen de la mayoría, se harán constar los ausentes o las *opiniones disidentes* de dichos miembros, *quienes podrán emitir su informe separadamente*". ([12]) (Énfasis suplido.)

De esa disposición se puede inferir que las minorías tenían derecho a estar representadas en las comisiones del Senado de 1917. Si se le reconocía el derecho a emitir opiniones disidentes y hasta informes separados, tenían por necesidad que reconocerle el derecho a formar parte de ellas. Véanse: B. Pagán, *Historia de los partidos políticos puertorriqueños*, Barcelona, Talleres Gráficos M. Pareja Montaña, 1972, T. I, pág. 185; Actas del Senado de Puerto Rico, Novena Asamblea Legislativa, 1917–1918, pág. XXVII. Este mismo patrón prevaleció en el Senado y en la Cámara hasta 1952. Véanse: Actas de la Cámara de Representantes de Puerto Rico, Décima

---

([10]) Ley de 12 de abril de 1900, Sec. 27 (31 Stat. 82).

([11]) En 1900 la Cámara de Representantes tenía un total de 31 comisiones que llevaban nombres idénticos a los de las comisiones congresionales. N. Rigual, *El Poder Legislativo de Puerto Rico*, Río Piedras, Ed. U.P.R. 1961, pág. 83.

([12]) Lenguaje idéntico contenía el Reglamento del Senado de 1950, Regla VIII (7). Véase la Regla XXV del Reglamento de la Cámara de Representantes, 1947.

Asamblea Legislativa, 1921–1924, pág. IX; Pagán, *op. cit.*, pág. 200; Actas del Senado, 1951, págs. IV–VIII; ([13]) F. Bayrón Toro, *Elecciones y partidos políticos de Puerto Rico*, 3ra ed. rev., Mayagüez, P.R., Ed. Isla, 1984, págs. 212–214.

Escritos de dos estudiosos del proceso legislativo durante la década del cuarenta confirman la práctica existente en aquel entonces de que las minorías pertenecían a todas las comisiones regulares y que el Presidente del cuerpo hacía las designaciones. En su tesis doctoral Trías Monge recomendó que se modificase el proceso de selección de la representación minoritaria en las comisiones y propuso que:

> . . . a los líderes de la *minoría* se les conceda el poder de seleccionar los *miembros de la minoría que deberán servir en las diferentes comisiones permanentes.* El oficial presidente de cada Cámara, será desde luego, el que determine cuántos puestos en cada Comisión estarán disponibles para la minoría, *que tiene que estar representada en todas las comisiones.* (Énfasis suplido y traducción nuestra.) J. Trías Monge, *Legislative and Judicial Reorganization in Puerto Rico* (tesis inédita), Escuela de Derecho de la Universidad de Yale, 1947, págs. 48–49.

Aunque esta propuesta ha sido discutida extensamente en el pasado, la misma no ha sido adoptada y es en el Presidente donde radicada actualmente el poder de designar los miembros de las comisiones.

Por otro lado, Serrano Geyls al referirse al papel desempeñado por las minorías para aquel entonces destacó que éstas "expresan en las *comisiones* y en el hemiciclo el punto de vista de la organización política a la cual pertenecen . . .". (Traducción nuestra.) R. Serrano Geyls, *Executive-Legislative Rela-*

---

([13]) Durante los años de 1949 al 1952 los únicos miembros del Senado que no pertenecían a la mayoría parlamentaria eran los señores Iriarte y Pagán. Estos eran miembros de *todas* las comisiones. Situación similar prevaleció en la Cámara de Representantes con el representante Figueroa Carrera. Actas del Senado, 1951, págs. IV–VIII.

*tionships in the Government of Puerto Rico: 1900–1954*, 14
Rev. Jur. U.I.A. 11, 40 (1979). Del análisis anterior conclui-
mos que para la fecha en que se convocó la Convención Consti-
tuyente en Puerto Rico las comisiones habían adquirido una
importancia crucial en el proceso legislativo. Independiente-
mente de si como cuestión de derecho, por uso y costumbre, o
como mera deferencia, en más de medio siglo de experiencia
legislativa las minorías siempre habían tenido representación
en los comités de cada Cámara.

*C. Las comisiones y la Constitución del E.L.A.*

■ La Constitución del Estado Libre Asociado elevó a
rango constitucional la existencia de las comisiones legisla-
tivas. J. Trías Monge, *Historia Constitucional de Puerto Rico*,
Río Piedras, Ed. U.P.R., 1982, T. III, págs. 152, 159–160;
Rigual, *op. cit.*, pág. 69. El Art. III, Sec. 17 de la Constitución
exige que se remita a un comité todo proyecto de ley. Véase 4
Diario de Sesiones de la Convención Constituyente 2584
(1952) ; 2 Diario de Sesiones, *supra*, pág. 854; Trías Monge,
*Historia Constitucional de Puerto Rico, op. cit.* La Sec. 14 del
Art. III extiende expresamente la protección de la inmunidad
parlamentaria a los trabajos en las comisiones.

El informe a la Convención Constituyente remitido por la
Escuela de Administración Pública de la Universidad de
Puerto Rico discutió las virtudes y desventajas del sistema de
comisiones y concluyó que constituían el "corazón del cuerpo
legislativo" en Puerto Rico. Escuela de Administración Pú-
blica, *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed.
U.P.R., 1954, pág. 411. Véase Serrano Geyls, *op. cit.*, págs.
40–41.

■ Por su parte, el informe de la Comisión de la Rama
Legislativa de la Convención Constituyente también destacó
la importancia de los comités:

La remisión a las comisiones da *rango constitucional* a un
sistema que se considera *eje del proceso legislativo moderno.*
(Énfasis suplido.) 4 Diario de Sesiones, *supra,* pág. 2584.

Desde entonces ambas Cámaras han fortalecido y ampliado el
poder de estas entidades. ([14]) Hoy constituyen el principal ve-
hículo de fiscalización y legislación de la Rama Legislativa. Es
precisamente por esa razón que hemos convalidado los poderes
investigativos de las comisiones y su facultad de citar testigos
so pena de desacato. *Peña Clos* v. *Cartagena Ortiz,* supra;
*Hernández Agosto* v. *Betancourt,* 118 D.P.R. 79 (1986). *Cf.
Pueblo* v. *Pérez Casillas,* 117 D.P.R. 380 (1986).

El pleito ante nuestra consideración es un claro ejemplo de
esto. Su génesis es precisamente una investigación especial del
Senado. Los planteamientos suscitados a través de la investi-
gación senatorial del caso del Cerro Maravilla han requerido
nuestra intervención para aclarar el alcance del poder de in-
vestigación del Senado y el ámbito de la inmunidad parlamen-
taria. *Peña Clos* v. *Cartagena Ortiz,* supra; *Romero Barceló* v.
*Hernández Agosto,* supra; *Hernández Agosto* v. *Betancourt,*
supra.

■ La Constitución no define lo que constituye una comi-
sión legislativa. Al amparo de la Sec. 9 del Art. III de la Cons-
titución, le corresponde al Poder Legislativo crear las comisio-
nes de cada cuerpo y delimitar su jurisdicción y facultades.

([14])El Art. 23 del Código Político, 2 L.P.R.A. sec. 5, faculta a los
miembros de una comisión a recibir juramentos de testigos en cualquier in-
vestigación; la Sec. 3 de la Ley de 21 de febrero de 1902 (2 L.P.R.A. sec.
14), faculta a la Asamblea Legislativa para castigar como desacato la in-
comparecencia de un testigo ante "cualquiera de las Cámaras o comisiones";
el Art. 31 del Código Político, 2 L.P.R.A. sec. 151, faculta a las comisiones
legislativas para citar testigos so pena de desacato y para requerir la en-
trega de documentos; el Art. 33 del Código Político, 2 L.P.R.A. sec. 153,
penaliza la incomparecencia de un testigo ante una comisión o subcomisión
de las Cámaras; el Art. 34.2 penaliza el perjurio ante las comisiones o sub-
comisiones. Por último, el Art. 35 le reconoce a los testigos que comparezcan
ante comisiones legislativas el derecho a no autoincriminarse.

En el ejercicio de sus poderes constitucionales, el Senado de Puerto Rico en la Regla XII del Reglamento sobre Procedimiento Legislativo creó quince (15) comisiones permanentes y otorgó al Presidente plenos poderes para crear comisiones especiales y designar los legisladores de mayoría y minoría que han de integrar todos los comités legislativos. Reglas VII y XII del Reglamento sobre Procedimiento Legislativo. Una de las comisiones permanentes creadas por el Senado en dicho ordenamiento es la Comisión de lo Jurídico. Por disposición reglamentaria esta Comisión está compuesta por nueve (9) senadores nombrados por el Presidente, los portavoces y los portavoces alternos de los partidos políticos, en su carácter *ex officio*.

▆ Aparte de los requisitos que el propio cuerpo establezca, existen unas condiciones mínimas constitucionales que debe tener una comisión de la Legislatura. Examinadas las experiencias históricas puertorriqueñas y la Constitución del Estado Libre Asociado, concluimos que uno de estos requisitos es que las minorías tengan la oportunidad de estar representadas. Ya hemos visto que esa era la costumbre en Estados Unidos y en Puerto Rico hasta 1952. Al aceptar la importancia de las comisiones en nuestra ley fundamental este requisito adquirió un carácter constitucional. [15]

Esta conclusión es inevitable si se examina el papel que las minorías desempeñan en nuestra democracia.

---

[15] Rigual, *op. cit.*, pág. 76. Con posterioridad a la aprobación de la Constitución en 1952 *todas* las Asambleas Legislativas han respetado este principio constitucional. Actas del Senado, 1953, págs. IV–XI; Actas del Senado, 1957, págs. IV–XI; Actas del Senado, 1965, págs. IV–X; Actas del Senado, 1973, págs. IV–X. Desde 1965 en la Cámara y 1969 en el Senado a las minorías se les reconoce el derecho a tener un *portavoz* en cada comisión. El actual reglamento de ambos cuerpos establece que el portavoz de la minoría es miembro *ex officio* de todas las comisiones.

## IV

EL PAPEL DE LAS MINORÍAS EN NUESTRO ESQUEMA CONSTITU-
CIONAL

■ Al aprobar la Constitución del Estado Libre Aso-
ciado de Puerto Rico en 1952 el pueblo de Puerto Rico favore-
ció la creación de un sistema de Gobierno democrático. Ele-
mento indispensable de una democracia es que el Gobierno sea
electo por una mayoría de los ciudadanos mediante un proceso
que garantice la más amplia participación de la comunidad.
La premisa básica de nuestro ordenamiento es que la mayoría
gobierna mediante sus representantes debidamente electos en
la Rama Legislativa. Sin embargo, nuestra Constitución tam-
bién incorporó en la Sec. 7 del Art. III un innovador meca-
nismo para garantizar la representación efectiva de las mino-
rías en la Asamblea Legislativa. Véase *Fuster* v. *Busó*, supra.
Este mecanismo "garantiz[a] la existencia efectiva de las
minorías, elemento indispensable en un gobierno democrático
constitucional como el nuestro". Ibíd., pág. 342. Véase 4 Dia-
rio de Sesiones, *supra*, págs. 2594–2597; Trías Monge, *Histo-
ria Constitucional de Puerto Rico, op. cit.*, págs. 142–146;
C. Ramos de Santiago, *El desarrollo constitucional de Puerto
Rico: Documentos y casos*, 2da ed. rev., Barcelona, Ed. Medi-
naceli, 1978, págs. 517–519. Otras disposiciones de nuestra
Constitución favorecen esta visión. Art. I, Sec. 1; Art. III,
Sec. 4. Véase 4 Diario de Sesiones, *supra*, págs. 2590–2592;
Trías Monge, *Historia Constitucional de Puerto Rico, op. cit.*,
Tomo III, págs. 269–270, 277–278.

■ El principio de "un hombre, un voto" consagrado por
nuestra Constitución no se limita solamente al proceso elec-
cionario. De nada sirve que a los ciudadanos se les garantice
su derecho al voto si luego aquellos que fueron depositarios de
la confianza de los electores son excluidos en momentos cru-
ciales del proceso legislativo.

■ Aunque el desarrollo jurisprudencial sobre este tema se limita al momento de escoger los candidatos y a evitar que el derecho al sufragio no sea diluido de tal forma que el voto de los ciudadanos se torne inefectivo, *Reynolds* v. *Sims*, 377 U.S. 533, 555. (1964), nuestro esquema constitucional en su protección a las minorías se extiende más allá del proceso eleccionario. Abarca también la composición de la Asamblea Legislativa para facilitar que represente a todos los sectores de la sociedad. Precisamente para fortalecer el carácter representativo se concibió un mecanismo para asegurar la participación política a las minorías en la Asamblea Legislativa:

> . . . [E]s básico para la salud democrática que las minorías tengan una representación que, aun *bajo las circunstancias más desfavorables, les permita cumplir adecuadamente su función de fiscalizar y estimular a la mayoría en su obra de gobierno sin crear entorpecimientos que puedan resultar en detrimento de la democracia.* En todo caso, el pueblo debe tener los medios para asegurarse de que sus representantes respondan siempre a la verdadera voluntad de los representados. (Énfasis suplido.) Informe de la Comisión de la Rama Legislativa de la Convención Constituyente, 4 Diario de Sesiones, *supra,* pág. 2590.

■ En este ordenamiento la mayoría parlamentaria tiene el deber ineludible de cumplir con el mandato expresado por el pueblo. Las minorías tienen una obligación especial de descargar su responsabilidad fiscalizadora sin obstaculizar el funcionamiento legislativo. Las Cámaras tienen los poderes e instrumentos necesarios para asegurar que tanto la mayoría como la minoría cumplan con sus obligaciones hacia el cuerpo y el país sin que se viole el equilibrio y el carácter representativo de la Rama Legislativa.

Al promulgar su reglamento el Senado de Puerto Rico reafirmó su compromiso de respetar y garantizar a las minorías su derecho a participar efectivamente en los trabajos del cuerpo:

Al aprobarlo, el Senado de Puerto Rico asegura el respeto debido a los derechos individuales de los senadores, a los de minoría y a los de la mayoría parlamentaria. Se ha tenido especial cuidado de que, reconociendo el derecho de la mayoría a tomar las decisiones que le correspondan, se garantice el de las minorías a ser escuchadas y a dejar constancia de sus puntos de vista . . . . A tono con el espíritu democrático que inspira la Constitución del Estado Libre Asociado de Puerto Rico, el Reglamento ofrece a todos los miembros del Senado la oportunidad de participar en los trabajos del cuerpo y establece los mecanismos para tal participación. *Reglamento sobre Procedimiento Legislativo para el Senado*, pág. 1.

■ Las comisiones son un mecanismo útil, eficiente y necesario para que la Asamblea Legislativa cumpla su mandato constitucional. Sus poderes emanan de los poderes del cuerpo. Al constituirlas no se puede socavar el mandato del electorado del pueblo, pero tampoco se puede debilitar el balance ideológico que asegura una participación efectiva de las minorías en el proceso legislativo al formar parte de las comisiones permanentes. Así lo reconocen las propias reglas del Senado al facultar a su presidente a nombrar los senadores de la minoría que forman parte de cada comisión. En el caso de la Comisión de lo Jurídico del Senado, tanto en esta sesión legislativa como en la pasada, había una adecuada representación de los partidos minoritarios.

■ Recibir testimonios y requerir documentos es una parte esencial del trabajo de las comisiones. *Peña Clos* v. *Cartagena Ortiz*, supra. ¿Cómo puede el delegado de la minoría emitir un voto inteligente sobre el informe de la Comisión cuando se le impidió participar en vistas? ¿Cómo puede emitir un voto disidente? ¿Cómo podrá el representante de la minoría informar al resto de su delegación? ¿A sus constituyentes? ¿Al cuerpo en sí? Si a las minorías se les impide estar presentes en una vista de una comisión no podrán cumplir cabalmente con su función parlamentaria. Cuando esto ocurre, este

sector importante del espectro político del país no estará adecuadamente representado en ese proceso.

## V

EFECTOS DE LA REGLA 7.1

Con este transfondo doctrinal debemos examinar el alcance del Reglamento para Regir la Investigación sobre los Sucesos del Cerro Maravilla y en especial su Regla 7.1. Dicho reglamento incluye una serie de disposiciones para asegurar la efectividad de la investigación, la participación de los senadores y los derechos de los testigos. La Regla 2 dispone que el quórum de la Comisión lo constituirá una mayoría de sus miembros con la excepción de cuando se cita a una vista pública o ejecutiva para escuchar testimonios o recibir documentos en cuyo caso el quórum consistirá de un miembro.

Los testigos serán citados según dispone el Código Político, asegurándose de esta forma una debida notificación. 2 L.P.R.A. secs. 151–152. Además, a todo testigo se le concederá tiempo razonable para prepararse para la vista, obtener representación legal y producir la evidencia requerida. Regla 3. Cuando el testimonio se haya tomado en sesión ejecutiva, antes de hacerlo público, se notificará al testigo. Regla 6 (B). Finalmente la Regla 6 (D) dispone que un testimonio ofrecido en sesión ejecutiva no se hará público si tiende a imputar a otras personas conducta difamatoria, denigrante o incriminatoria a menos que cumpla con los siguientes requisitos: (1) que a la persona afectada se le informe y se le dé oportunidad de comparecer ante una sesión ejecutiva de la Comisión; (2) que dicho testimonio de reputación se publique simultáneamente, y (3) que la *mayoría* de la Comisión apruebe la publicación de los testimonios.

La Regla 7 dispone la forma en que se recibirán los testimonios en sesión ejecutiva o en sesión pública. La evidencia obtenida en sesión ejecutiva será secreta. Solamente se hará

pública cuando lo determine la mayoría de la Comisión. Regla 7(B). Las únicas personas autorizadas a estar presentes durante una sesión ejecutiva son *los miembros de la comisión,* el personal técnico, la representación legal del testigo y cualquier otra persona que la *Comisión* autorice.

No obstante, la Regla 7.1 faculta al Presidente de la Comisión de lo Jurídico del Senado a citar a un testigo bajo apercibimiento de desacato a comparecer a una sesión ejecutiva compuesta por el Presidente y cualquier otra persona seleccionada por él. En otras palabras, la Regla 7.1 faculta al Presidente de la Comisión de lo Jurídico del Senado a constituirse él como la Comisión y a excluir de la sesión ejecutiva a los otros miembros. En el presente caso, al amparo del poder delegado por la Regla 7.1, el Presidente de la Comisión citó a testigos para que declararan en una sesión ejecutiva en la que se le impidió a los miembros de la minoría estar presentes. Dicha exclusión no estuvo fundada en una sanción disciplinaria tomada por el cuerpo al amparo de su poder inherente de aprobar las medidas necesarias para mantener sus procedimientos en orden.

Alega el Senado que esto en nada afecta las prerrogativas de la minoría, pues eventualmente tendrá acceso al testimonio. Sin embargo, este argumento no responde adecuadamente al problema creado por esta disposición. En primer lugar, el Presidente es quien determina si el testimonio le puede ser sometido o no a la Comisión en pleno. Aunque el Reglamento requiere que los testimonios utilizados en el informe final se le sometan a la Comisión en pleno, la Regla 7.1 establece las condiciones para que los miembros excluidos jamás se enteren del contenido de las comparecencias que no apoyaban las conclusiones del informe. Si el Presidente entiende que el testimonio ofrecido ante él no amerita ser sometido a todo el comité, los demás miembros, y en especial la representación minoritaria, nunca conocerán el contenido de éste.

En segundo lugar, el acceso que con posterioridad puedan tener los demás miembros de la Comisión al testimonio vertido ante el Presidente y el investigador, no les permite evaluar responsablemente la comparecencia original, pues se les impide interrogar al testigo y observar su comportamiento. Aun si se cita nuevamente al testigo ante la Comisión en pleno, los miembros no podrán comparar los testimonios ofrecidos en ambas ocasiones.

Por último, al citar una reunión al amparo de la Regla 7.1 el Presidente de la Comisión intenta ejercer todos los poderes y prerrogativas que nuestra Constitución y el ordenamiento le otorgan a las comisiones permanentes, entre éstos, el poder de citar so pena de desacato, procesar por desacato y perjurio. Para que estas facultades se puedan invocar la Constitución exige que la Comisión esté debidamente constituida. Es requisito indispensable para lograr esto, que a las minorías se les dé la oportunidad de estar representadas.[16]

■ No debe haber dudas de que la Regla 7.1 versa sobre un asunto esencial en una etapa significativa de los procesos investigativos y deliberativos de la Comisión. Es un requisito constitucional que las minorías tengan la facultad de participar en ese proceso. Al poner en vigor la disposición de la Regla 7.1 que le permite al Presidente de la Comisión de lo Jurídico del Senado excluir a los demandantes de las sesiones ejecutivas en que se iba a recibir prueba documental y escuchar los testimonios de las personas citadas bajo apercibimiento de desacato, el Secretario y el Sargento de Armas del Senado infringen los derechos constitucionales de los representantes de las minorías garantizados tanto por el Art. III de la Constitución del Estado Libre Asociado de Puerto Rico como por el Reglamento del Senado. No incidió el tribunal de instancia al

---

[16] Si la minoría voluntariamente se abstiene de participar, la Comisión podría válidamente reunirse.

ordenarle a los funcionarios del Senado que se abstuvieran de poner en vigor esa parte de la Regla 7.1.

*Se confirmará la sentencia recurrida.*

El Juez Asociado Señor Rebollo López concurre en el resultado y se reserva el derecho a emitir opinión a esos efectos en el futuro. El Juez Asociado Señor Ortiz y la Juez Asociada Señora Naveira de Rodón se inhibieron.

—O—

Voto concurrente emitido por el Juez Asociado Señor Rebollo López.

San Juan, Puerto Rico, a 22 de diciembre de 1986.

La opinión que emite una mayoría de este Tribunal en el presente caso *correctamente reconoce y resuelve que*: la Constitución del Estado Libre Asociado de Puerto Rico elevó a rango constitucional la existencia de las comisiones legislativas; que éstas constituyen el eje del proceso legislativo moderno y el principal vehículo de fiscalización y legislación de la Rama Legislativa; que independientemente de los requisitos que el propio Senado establezca mediante reglamento, nuestra Constitución exige, como condición mínima, que las minorías estén representadas en las comisiones; que de nada sirve que a los ciudadanos se les garantice su derecho al voto si luego aquellos que fueron depositarios de su confianza son excluidos en momentos cruciales del proceso legislativo; que al seleccionar los componentes de las comisiones no se puede socavar el mandato del electorado del pueblo; que nuestra Constitución *"no define* lo que constituye una comisión legislativa" (énfasis suplido), y que una disposición como la Regla 7.1 en controversia —que permite la exclusión de la minoría de los trabajos de una de las comisiones legislativas— viola la Constitución del Estado Libre Asociado por cuanto contraviene no sólo los principios generales antes enunciados sino ese "inno-

vador mecanismo" consagrado en la Sección Séptima del Art. III que *garantiza* la representación efectiva de la minoría en nuestra Asamblea Legislativa.

Ello no obstante, y por los fundamentos que a continuación exponemos, nos vemos impedidos de suscribir totalmente la opinión emitida por el Tribunal.

## I

Una lectura cuidadosa de la opinión mayoritaria revela un *lenguaje restrictivo* que puede causar, en la mente de algunas personas, confusión sobre la norma implantada. (1) Dicha opinión puede dar la impresión que *limita* la norma que establece a situaciones en que únicamente están envueltas *comisiones permanentes* del Senado de Puerto Rico. Esto es, aparenta no hacer extensivo lo resuelto a las *comisiones especiales*, o de cualquier otra índole, que continuamente se crean en nuestra Asamblea Legislativa con *fines y propósitos similares* a los de las comisiones permanentes.

---

(1) A la pág. 71 de la opinión mayoritaria se resuelve:

"Las comisiones son un mecanismo útil, eficiente y necesario para que la Asamblea Legislativa cumpla su mandato constitucional. Sus poderes emanan de los poderes del cuerpo. Al constituirlas no se puede socavar el mandato del electorado del pueblo, pero tampoco se puede debilitar el balance ideológico *que asegura una participación efectiva de las minorías en el proceso legislativo al formar parte de las comisiones permanentes.* Así lo reconocen las propias reglas del Senado al facultar a su presidente a nombrar los senadores de la minoría que forman parte de cada comisión. En el caso de la Comisión de lo Jurídico del Senado, tanto en esta sesión legislativa como en la pasada, había una adecuada representación de los partidos minoritarios." (Énfasis suplido.)

En adición, a la pág. 74, se expresa:

"Por último, al citar una reunión al amparo de la Regla 7.1 el Presidente de la Comisión intenta ejercer *todos los poderes y prerrogativas que nuestra Constitución y el ordenamiento le otorgan a las comisiones permanentes*, entre éstos, el poder de citar so pena de desacato, procesar por desacato y perjurio. Para que estas facultades se puedan invocar la Constitución exige que la Comisión esté debidamente constituida. Es requisito indispensable para lograr esto, que a las minorías se les dé la oportunidad de estar representadas." (Énfasis suplido.)

Ahora bien, la mejor evidencia de que la norma implantada no está limitada al caso de comisiones permanentes y que, por el contrario, aplica a *toda clase* de comisiones está contenida en la propia opinión que se emite. La mayoría del Tribunal, con el propósito de justificar la opinión y con el fin de demostrar la sabiduría y corrección de la misma, *se pregunta y expresa:*

¿Cómo puede el delegado de la minoría emitir un voto inteligente sobre el informe de la Comisión cuando se le impidió participar en vistas? ¿Cómo puede emitir un voto disidente? ¿Cómo podrá el representante de la minoría informar al resto de su delegación? ¿A sus constituyentes? ¿Al cuerpo en sí? Si a las minorías se les impide estar presentes en una vista de una comisión no podrán cumplir cabalmente con su función parlamentaria. Cuando esto ocurre, este sector importante del espectro político del país no estará adecuadamente representado en ese proceso. Págs. 71–72.

*Preguntamos nosotros:* A los fines antes expresados, ¿acaso existe diferencia entre el miembro minoritario de una comisión permanente y el de una comisión especial? La contestación parece ser obvia.

La Constitución, según la propia opinión de la mayoría, "no define lo que constituye una comisión legislativa". Si los fundamentos aducidos en la opinión mayoritaria son válidos —como creemos que lo son— es obvio que este Tribunal no puede definir restrictivamente dicho término en perjuicio de los derechos de los ciudadanos que nuestra Constitución tiene el propósito de proteger.

## II

La opinión emitida —no obstante reconocer que la Regla 7.1 en controversia *"faculta al Presidente* de la Comisión de lo Jurídico del Senado *a constituirse él solo como la Comisión* y a *excluir* de la sesión ejecutiva *a los otros miembros"* (énfasis suplido)— meramente resuelve que dicha regla resulta in-

constitucional *al ser aplicada* por el Secretario y el Sargento de Armas del Senado de Puerto Rico. Esto es, aparentemente indeciso sobre su facultad para declarar nula la disposición en sí, el Tribunal *se limita* a resolver que la referida regla es inconstitucional *en su aplicación.*

En primer lugar, somos del criterio que los fundamentos aducidos en la opinión mayoritaria —los cuales resumimos al comienzo de la presente ponencia— son más que suficientes para sostener que la citada Regla 7.1 *es inconstitucional de su faz.* En segundo lugar, entendemos que este Tribunal —como intérprete último de la Constitución del Estado Libre Asociado de Puerto Rico— está plenamente facultado para realizar dicha determinación y que la misma, dados los hechos particulares del presente caso, no constituye una intromisión de este Tribunal en los "procedimientos internos de una investigación legislativa legítima y de su reglamentación" como sostiene la distinguida representación legal del Senado en la solicitud de revisión que radicara. ([2])

No debe caber duda que la Asamblea Legislativa de Puerto Rico tiene el poder constitucional para reglamentar sus "asuntos internos" sin temor a que la Rama Judicial esté constantemente "supervisando" sus actuaciones.

Ahora bien, una reglamentación aprobada por cualesquiera de los dos cuerpos camerales de la Legislatura de Puerto Rico que, como en el presente caso, viole y afecte directamente derechos fundamentales que nuestra Constitución les garantiza a sus ciudadanos —tales como el derecho al voto y a estar debidamente representados— *no* cualifica como "asunto interno" exento de escrutinio y determinación final por este Tribunal. ([3]) *Santa Aponte* v. *Srio. del Senado,* 105 D.P.R.

---

([2]) Véase párrafo tercero de la pág. 13 de la solicitud de revisión.

([3]) Debe mantenerse presente que una actuación, como la aquí impugnada, realizada por el Presidente de la Comisión de lo Jurídico del Senado de Puerto Rico al amparo de la referida Regla 7.1 no sólo puede afectar los derechos de aquellos individuos que son citados a comparecer ante dicha

750, 766 (1977); *Corujo Collazo* v. *Viera Martínez*, 111 D.P.R. 552, 561 (1981); *Vélez Ramírez* v. *Romero Barceló*, 112 D.P.R. 716, 731 (1982).

Conviene recordar que los poderes y facultades que posee la Asamblea Legislativa emanan de la Constitución del Estado Libre Asociado de Puerto Rico. En su consecuencia, *sus actuaciones* —en tanto y en cuanto afecten derechos fundamentales de los ciudadanos de este país e independientemente de la inmunidad contra demandas que cobija a los señores legisladores relativa a sus funciones como tales— *tienen que ser conforme a los principios y directrices contenidas en la Constitución,* so pena de ser declarados nulos e inexistentes por este Tribunal; facultad precisamente concedida a esta institución por la Constitución del Estado Libre Asociado de Puerto Rico.

Regístrese y notifíquese.

---

Comisión *sino que afecta el derecho a estar representado de todos los ciudadanos (electores) que eligieron a los miembros de esa minoría parlamentaria que se pretende excluir de los trabajos de la Comisión.*