Roberto Rexach Benítez et al., demandantes y recurrentes, *v.* El Gobernador de Puerto Rico, Hon. Rafael Hernández Colón, etc., demandados y recurridos.

*Número:* RE-87-472          *Resuelto:* 4 de noviembre de 1987

*Amancio Arias Cestero,* de *Arias Cestero & Arias Guardiola,* abogado de los recurrentes; los recurridos no comparecieron.

## RESOLUCIÓN

En vista de que la revisión se da contra la sentencia y no sus fundamentos, y considerando que del recurso y sus anejos no se desprende una violación de la doctrina pautada en *Silva* v. *Hernández Agosto,* 118 D.P.R. 45 (1986), que amerite nuestra intervención, a la solicitud de revisión, no ha lugar.

Lo acordó el Tribunal y certifica el señor. Secretario General. El Juez Asociado Señor Hernández Denton emitió un voto particular de conformidad. Los Jueces Asociados Señores Negrón García y Rebollo López emitieron votos disidentes separados.

(*Fdo.*) Bruno Cortés Trigo
*Secretario General*

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

No obstante aparentemente rechazar —como veremos más adelante, realmente no existe otra alternativa— como incorrectos los fundamentos que adujera el Tribunal Superior de Puerto Rico, Sala de San Juan, en apoyo de la sentencia desestimatoria que emitiera en el presente caso, una mayoría de los integrantes de este Tribunal, mediante resolución al efecto, deniega la solicitud de revisión interpuesta por los legisladores recurrentes por el fundamento específico de que "del recurso y sus anejos no se desprende una *violación de la doctrina* pautada en *Silva*

v. *Hernández Agosto,* 118 D.P.R. 45 (1986), *que amerite nuestra intervención".* (Énfasis suplido.)

La referida actuación constituye un abrupto, sorprendente e inexplicable cambio de dirección mediante el cual se ignora un claro, aplicable, y jurídicamente correcto precedente de *reciente confección* por parte de este mismo Tribunal. Al así actuar se permite que se violente un derecho constitucional de gran envergadura que resulta de vital importancia a nuestro sistema democrático de gobierno.

Mediante la referida resolución, increíblemente se establece la norma de que la violación del Derecho constitucional de las minorías parlamentarias en nuestro país a tener *plena* participación en el proceso legislativo es uno "de grados", la protección del cual está sujeto a la sana discreción y buen juicio de los integrantes de este Tribunal. El lamentable error cometido es uno tan obvio y de tal magnitud que el mismo "resalta [*sic*] a la vista y hiere la retina". *In re Roldán González,* 113 D.P.R. 238, 242 (1982).

Para poder uno percatarse de la corrección de los anteriores señalamientos basta con una somera lectura de lo expresado por este Tribunal en el antes mencionado caso de *Silva* v. *Hernández Agosto,* supra, hace escasamente unos once meses y en la decisión emitida en *Hernández Agosto* v. *Romero Barceló,* 112 D.P.R. 407 (1982).

I

El 13 de abril de 1987 los comparecientes senadores del Partido Nuevo Progresista radicaron petición de sentencia declaratoria e *injunction* con el propósito de que se declarara la inconstitucionalidad de ciertas leyes aprobadas en la sesión extraordinaria que comenzó el 18 de diciembre

de 1986 y que concluyó el 24 de ese mismo mes.(1) Alegaron en síntesis los senadores de la minoría novoprogresista del Senado, como fundamento para impugnar la validez legal de la legislación en cuestión, que: *(1) dichos proyectos de ley fueron sometidos a la consideración del Senado, sin haber sido citados los senadores de minoría a sesiones ejecutivas para discutir o considerar el informe y para poder someter cualquier informe disidente; (2) los referidos senadores no tuvieron oportunidad de participar en las Conferencias Legislativas en los casos en que hubo que dirimir diferencias entre lo aprobado por la Cámara y el Senado, y (3) que les fue negado a ellos copia de los informes, estudios y cualquier otro material existente que tuviere relevancia con los referidos proyectos de ley.*

Adujeron los demandantes que dichas actuaciones por parte de los senadores de la mayoría constituían una violación al Reglamento del Senado(2) y a la Constitución del Estado Libre Asociado de Puerto Rico —que les garantiza a las minorías parlamentarias el derecho de participar en todas las fases del proceso legislativo— al impedírsele intervenir en momentos *cruciales* del trámite legislativo.

*Con relación a la aprobación del proyecto de ley dirigido a enmendar la Regla 44.1 de Procedimiento Civil, 32*

---

(1) Las leyes aprobadas en la referida sesión y cuya anulación se solicita son las siguientes:

(1) Las medidas legislativas para tratar el asunto de la impericia médica. *Leyes Núms. 1, 3, 4 y 6 de 30 de diciembre de 1986.*

(2) La Nueva Ley de Incentivos Contributivos de Puerto Rico. *Ley Núm. 8 de 24 de enero de 1987.*

(3) Ley que transfiere a la Autoridad de Teléfonos de Puerto Rico los servicios de radio y televisión públicos del Departamento de Instrucción Pública. *Ley Núm. 7 de 21 de enero de 1987.*

(4) Ley que enmienda la Regla 44.1 de Procedimiento Civil. *Ley Núm. 2 de 30 de diciembre de 1986.*

(2) Regla XIV, 1(1), 1(3), 1(8) y 1(9), Reglamento del Senado de 15 de mayo de 1984. Anejo 1, págs. 630–634.

*L.P.R.A. Ap. III, alegan los demandantes recurrentes que*
*el mismo no fue incluido en la convocatoria a la sesión*
*extraordinaria, siendo por tanto aprobado en violación de*
*la Sec. 10, Art. III, Const. E.L.A., L.P.R.A., Tomo 1, ed.*
*1982, pág. 341.*

Los demandados radicaron moción de desestimación
alegando que los demandantes carecían de capacidad para
demandar, que la controversia no era justiciable por
constituir una cuestión política, e invocaron la abstención
del tribunal bajo la doctrina de separación de poderes. El
tribunal de instancia, mediante Sentencia de 13 de agosto
de 1987 *declaró con lugar la moción de desestimación de los*
*demandados, determinando que los demandantes carecían*
*de capacidad para demandar y que la controversia no era*
*una justiciable.*

Denegada su moción de reconsideración, acuden ante
este Tribunal los demandantes imputándole error al así
actuar al foro de instancia. Citan como autoridad principal
la decisión que emitiéramos en el caso de *Silva* v. *Hernández*
*Agosto,* ante.

## II

No debe haber duda en la mente de persona alguna que
los demandantes recurrentes tienen capacidad (*standing*)
para radicar la acción que incoaron y de que, prima facie,
la controversia planteada en dicha acción es una que es
justiciable, hecho que acepta, *sub silentio*, la mayoría de los
integrantes del Tribunal en la resolución de la cual
disentimos.

*A. CAPACIDAD*: En relación con la capacidad para
demandar, en *Hernández Agosto* v. *Romero Barceló*, ante,
págs. 414–415, este Tribunal expresó que:

> Es indispensable que el promovente de la causa de acción
> alegue haber sufrido un claro y palpable daño. *Fund.*

*Arqueológica* v. *Depto. de la Vivienda,* supra. El daño debe ser real, inmediato y preciso; no puede ser abstracto o hipotético. *Warth* v. *Seldin,* supra; *Gladstone, Realtors* v. *Village of Bellwood,* supra. La causa de acción debe surgir bajo el palio de la constitución o de una ley. *Fund. Arqueológica* v. *Depto. de la Vivienda,* supra; *Salas Soler* v. *Srio. de Agricultura,* supra; y debe establecerse una conexión entre el daño y la causa de acción ejercitada. *Village of Arlington Heights* v. *Metropolitan Housing Corp.,* supra; véase, además, *Should Congress Defend its Own Interest Before the Court,* 33 Stan. L. Rev. 715 (1981).

En la jurisdicción federal se admite sin discusión la capacidad jurídica de los cuerpos legislativos para comparecer por sí o autorizar a uno de sus miembros o un comité del cuerpo para representarlo en los tribunales. *United States* v. *American Tel. and Tel. Co.,* 551 F.2d 384, 391 (1976); *Congressional Access To The Federal Court,* 90 Harv. L. Rev. 1632 (1977).

En el caso que hoy nos ocupa, se cumple con todos los requisitos esbozados por la jurisprudencia para que exista capacidad para demandar. Los promoventes de la presente causa de acción alegan haber sufrido un claro y palpable daño; esto es, que las actuaciones de los senadores de la mayoría en violación al Reglamento del Senado y a nuestra Constitución, la cual les garantiza a las minorías parlamentarias el derecho de participar en todas las fases del proceso legislativo, *les impidió intervenir en momentos cruciales del trámite legislativo, menoscabándose así sus funciones constitucionales como senadores.* Tal y como lo afirman los recurrentes en su Recurso de Revisión, pág. 9: "Aquí se trata[,] nada menos[,] que de su exclusión durante las deliberaciones de varias comisiones relativas a legislación bajo consideración del Senado". Es un daño real, inmediato y preciso. La causa de acción surge bajo el palio de la Constitución, y por último, existe una conexión entre el daño y la causa de acción ejercitada, ya que la anulación de la legislación aprobada en alegada violación del Reglamento del Senado y de nuestra Constitución evitaría

que se pongan en vigor leyes para la aprobación de las cuales no se contó con la participación plena en todas las etapas cruciales del proceso legislativo de los representantes del partido de minoría en el Senado *y que por tanto no constituyen la verdadera expresión del pueblo.* Más aún, en el citado caso de *Silva* v. *Hernández Agosto,* ante, resolvimos, en cuanto a la capacidad para demandar de los legisladores en específico, que éstos "en su condición de miembros de la Asamblea Legislativa tienen capacidad jurídica para vindicar sus prerrogativas y funciones constitucionales".

Este caso no es uno de una mera disminución de influencia en el ejercicio del voto de los senadores de la minoría, como erróneamente expresa el tribunal de instancia y parece ratificar una mayoría de los Jueces de este Tribunal. Resulta irrelevante la posición a los efectos de que los senadores demandantes tuvieron la oportunidad de participar en el debate llevado a cabo *en el hemiciclo* del Senado. No es su participación y su voto en el hemiciclo lo que los demandantes recurrentes cuestionan, *sino su participación y voto en etapas anteriores "cruciales" del proceso legislativo.* Es su participación y voto en las *comisiones legislativas,* que es donde se recoge información pertinente a los proyectos sometidos a consideración legislativa y donde se delibera en relación con éstos, lo que impugnan los demandantes. Recordemos que en *Silva* v. *Hernández Agosto,* ante, pág. 66, calificamos como "crucial" el trabajo que realizan las Comisiones del Senado y de la Cámara. Dijimos en *Silva* v. *Hernández Agosto,* ante, pág. 66:

El informe de la Convención Constituyente remitido por la Escuela de Administración Pública de la Universidad de Puerto Rico discutió las virtudes y desventajas del sistema de comisiones y concluyó que constituían el *"corazón del cuerpo legislativo"* en Puerto Rico. ...

Por su parte, el informe de la Comisión de la Rama Legislativa de la Convención Constituyente también destacó la importancia de los comités:

"La remisión a las Comisiones da *rango constitucional* a un sistema que se considera *eje del proceso legislativo moderno.*" (Énfasis suplido.) 4 Diario de Sesiones, *supra*, pág. 2584.

Desde entonces ambas Cámaras han fortalecido y ampliado el poder de estas entidades. Hoy constituyen el principal vehículo de fiscalización y legislación de la Rama Legislativa.

*B. JUSTICIABILIDAD*: Es el planteamiento de los demandados recurridos, acogido por el tribunal de instancia, que la autoridad otorgada por la Constitución a cada Cámara para gobernarse internamente incluye la facultad para estructurar sus comisiones y disponer de todo lo relativo a su procedimiento interno, y que sobre esto el Poder Judicial no tiene ninguna inherencia por tratarse de un asunto estrictamente político. En *Silva* v. *Hernández Agosto*, ante, págs. 54–55, expusimos la doctrina *en cuanto a justiciabilidad sobre asuntos políticos.*

No fue hasta *Baker* v. *Carr*, 369 U.S. 186, 217 (1962), que el Tribunal Supremo federal estableció los criterios generales para determinar la aplicabilidad de la doctrina de cuestión política. Requirió que exista uno de los siguientes elementos: (1) una delegación expresa del asunto en controversia a otra rama del gobierno; (2) la ausencia de criterios o normas judiciales apropiadas para resolver la controversia; (3) la imposibilidad de decidir sin hacer una determinación inicial de política pública que no le corresponde a los tribunales; (4) la imposibilidad de tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno; (5) una necesidad poco usual de adherirse, sin cuestionar, a una decisión política tomada previamente, y (6) potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos del Gobierno sobre un punto. Véanse: *Powell* v. *McCormack*, 395 U.S. 486 (1969); *Gilligan* v. *Morgan*, 413 U.S. 1 (1973); *United States* v. *Nixon*, 418 U.S. 683 (1974); *Goldwater* v. *Carter*, 444 U.S. 996 (1979); *Crockett* v. *Reagan*, 720 F.2d 1355 (1983).

En Puerto Rico la doctrina de cuestión política no ha tenido el mismo arraigo que en Estados Unidos. En *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977), al interpretar el poder de exclusión de la Sec. 9 del Art. III de la Constitución concluimos que "los cuerpos legislativos *no pueden convertirse en los jueces constitucionales de sus propios poderes. Es a los tribunales a quienes les toca interpretar las leyes y la Constitución*". En esa ocasión al examinar la justiciabilidad de la controversia reiteramos los pronunciamientos del Supremo federal en *Baker* v. *Carr*, supra, pág. 209, "[e]*l mero hecho que el pleito busca la protección de un derecho político no quiere decir que el mismo presenta una cuestión política*".

En todas las ocasiones anteriores ante reclamos de cuestión política *hemos reafirmado el poder de los tribunales de ser los intérpretes finales de los contornos de la Constitución y para determinar si los actos de una rama de gobierno exceden su autoridad constitucional. Marbury* v. *Madison*, 1 Cranch 137 (1803); *Santa Aponte* v. *Srio. del Senado*, supra. La interpretación inicial que de la Constitución haga otra rama merece deferencia, pero debe prevalecer la norma de que *la determinación final corresponde a los tribunales. United States* v. *Nixon*, supra. *Nuestra estructura de gobierno no permite que las ramas políticas del Gobierno se conviertan en árbitros de sus propios actos.* Véanse: *The Supreme Court, 1968 Term*, 83 Harv. L. Rev. 62, 68 (1969); H. Wechsler, *Toward Neutral Principles of Constitucional Law*, 73 Harv. L. Rev. 1 (1959); Henkins, *op. cit.*; Redish, *op. cit.*; Tribe, *op. cit*; Nowak, Rotunda y Young, *op. cit.*; A. Bickel, *The Least Dangerous Branch*, 2da ed., Connecticut, Yale U. Press., 1986, págs. 183-198. (Énfasis suplido.)

En *Silva* v. *Hernández Agosto*, ante, se alegaba, al igual que en el caso que hoy nos ocupa, que la controversia no era justiciable, entre otras cosas, por tratarse de una materia expresamente delegada a la Asamblea Legislativa, o sea, la facultad de adoptar reglas internas.

Sobre esto nos expresamos, *Silva* v. *Hernández Agosto*, ante, págs. 55-56, en el sentido de que:

Desde hace siglos se ha aceptado que los cuerpos legislativos pueden adoptar reglas de gobierno interno, como corolario del poder inherente de controlar sus procedimientos. ... En 1952 nuestra Constitución incorporó de manera clara y expresa la facultad de las Cámaras de Puerto Rico para adoptar *"las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno"*. Art. III, Sec. 9. Nuestra Asamblea Legislativa, así como la Cámara de Representantes y el Senado de Estados Unidos, han autorizado a sus comisiones a adoptar reglas para su gobierno interno que no estén en contradicción con las reglas generales de cada cuerpo.

*Sin embargo, es doctrina firmemente establecida que al ejercer su función de reglamentar, la Asamblea Legislativa y las comisiones no pueden obviar e ignorar las limitaciones constitucionales.* El Tribunal Supremo federal, en *United States* v. *Ballin*, 144 U.S. 1, 5 (1982), examinó la validez de una regla del Congreso y concluyó:

"Ante la Corte la controversia es una sólo de poder. La Constitución faculta a cada cámara a determinar sus reglas de procedimiento. *No pueden mediante sus reglas ignorar limitaciones constitucionales o violar derechos fundamentales.* ... " (Traducción nuestra.)

Véanse: *United States* v. *Smith*, 286 U.S. 6 (1932); *Yellin* v. *United States*, 374 U.S. 109, 114 (1963); *Kilbourn* v. *Thompson*, 103 U.S. 168, 199 (1880). (Énfasis suplido y escolios omitidos.)

No ponemos en duda la facultad constitucional de cada Cámara Legislativa de disponer de todo lo relativo a su procedimiento interno, y que la Rama Judicial no debe inmiscuirse en ello *cuando dicha facultad se ejerce dentro de los parámetros constitucionales*. Pero cuando una regla o actuación relativa a los procedimientos internos de las Cámaras Legislativas violenta derechos constitucionales, los tribunales no sólo tienen inherencia en el asunto, *sino que están obligados a intervenir* como últimos intérpretes de la Constitución. *Marbury* v. *Madison*, ante.

*C.* También dispone el caso de *Silva* v. *Hernández Agosto*, ante, págs. 57–58, del planteamiento de que cualquier

intervención de la Rama Judicial en esta controversia violaría el principio de separación de poderes.

El Art. III de nuestra Constitución, así como el Art. II, Sec. 2 y el Preámbulo están predicados en la existencia de *un gobierno democrático y representativo.* Las Secs. 14 y 17 del Art. III de la Constitución hacen referencia directa a la existencia de las comisiones legislativas. *Es función ineludible de los tribunales interpretar la Constitución y velar que el espíritu y el esquema democrático de esta Carta no se vulnere. Fuster* v. *Busó,* 102 D.P.R. 327 (1974); *García Passalacqua* v. *Tribunal Electoral,* 105 D.P.R. 49 (1976); *Santa Aponte* v. *Srio. del Senado,* supra; *Vélez Ramírez* v. *Romero Barceló,* 112 D.P.R. 716, 731–734 (1982).

Por último, señala el Senado que la controversia constituye una cuestión política porque cualquier intervención sería una falta de respeto y deferencia a la Asamblea Legislativa. La teoría de la separación de poderes requiere que las facultades delegadas por el pueblo en la Carta Constitutiva se distribuyan entre las tres ramas. Su premisa es evitar la concentración de poderes en una sola. La relación entre los poderes del Gobierno debe ser dinámica y armoniosa. Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Su perdurabilidad requiere que cuando haya conflicto sobre el alcance de los poderes constitucionales de cualquiera de ellas, los tribunales intervengan con prudencia y deferencia para aclarar los contornos de la Constitución y facilitar la resolución de las diferencias.

*En este contexto, determinar las normas constitucionales mínimas que deben regir el funcionamiento de las comisiones no constituye una indebida intromisión en los trabajos de la Rama Legislativa.* Los senadores de la minoría han acudido a los tribunales para que resolvamos este problema. *La determinación final de esta controversia es un asunto para el cual los tribunales estamos preparados y tenemos la experiencia y autoridad constitucional para tomar una decisión que responda a las circunstancias históricas de nuestro país.* (Énfasis suplido.)

A la luz de todo lo antes expuesto, no queda otra alternativa —jurídicamente correcta, naturalmente— que concluir que los demandantes tenían capacidad para demandar; que, a la luz de las alegaciones de éstos, el asunto era uno prima facie justiciable y uno sobre el cual los tribunales tienen inherencia, por lo que ciertamente el tribunal de instancia debió haber declarado sin lugar la solicitud de desestimación radicada por los demandados y ordenar la celebración de una vista plenaria con el propósito de que se dilucidaran las alegaciones de las partes.

## III

Lo verdaderamente preocupante de la actuación del Tribunal, sin embargo, lo constituye el lenguaje en que está concebida la resolución que se emite. Como hemos visto, el Tribunal se niega a expedir el auto solicitado —no obstante su aparente inconformidad con las razones jurídicas aducidas por el tribunal de instancia— por el fundamento de que del "recurso y sus anejos no se desprende *una violación de la doctrina* pautada en *Silva* v. *Hernández Agosto,... que amerite nuestra intervención*". (Énfasis suplido.)

Procede que nos preguntemos: ¿cuál es la *doctrina* que este Tribunal entendió procedente establecer en el citado caso de *Silva* v. *Hernández Agosto*, ante?

Resolvimos en el mencionado caso que a pesar de que la "premisa básica de nuestro ordenamiento es que la mayoría gobierna mediante sus representantes debidamente electos en la Rama Legislativa", nuestra Constitución —a diferencia de otras— contiene un "innovador mecanismo" *que garantiza* "la *representación efectiva* de las minorías en la Asamblea Legislativa"; que el "principio de 'un hombre, un voto' consagrado por nuestra Constitución no se limita solamente al proceso eleccionario", por cuanto de "nada sirve que a los ciudadanos se les garantice su

derecho al voto si luego aquellos que fueron depositarios de la confianza de los electores *son excluidos en momentos cruciales* del proceso legislativo", *y que, como consecuencia de todo lo antes expuesto,* los miembros de las minorías parlamentarias en nuestra Asamblea Legislativa, *por imperativo constitucional,* tienen el derecho a participar en las etapas esenciales o significativas de los procesos investigativos y deliberativos de las comisiones legislativas. *En otras palabras, la violación de la doctrina establecida en Silva v. Hernández Agosto, ante, pág. 69, necesariamente implica la violación del derecho constitucional de las minorías parlamentarias de nuestro país a participar en las etapas esenciales y cruciales del debate legislativo.*

Ante esta situación resulta alarmante la posición que asume en el presente caso una mayoría de los integrantes de este Tribunal; en su opinión, no es que no exista una violación de la referida doctrina, es que no existe una violación *que amerite* la intervención del Tribunal. Somos del criterio que no existen grados en las violaciones de los derechos constitucionales. Puede existir un curso de acción o patrón de conducta que, aun cuando interfiera con un derecho constitucional, el mismo no constituya una violación de dicho derecho. Una vez se determina, sin embargo, que la interferencia constituye una violación, la misma es una sin cualificaciones. Al enfrentarse con la violación de un derecho constitucional de uno de nuestros ciudadanos, este Tribunal —como intérprete máximo de nuestra Constitución— no tiene discreción alguna para negarse a intervenir en su reparación.

IV

Un comentario al margen relativo al voto particular de conformidad emitido por el compañero Juez Hernández Denton, Juez ponente en el citado caso de *Silva* v. *Hernández*

*Agosto*, ante. Resulta evidente que en la ponencia que hoy emite, intenta variar la doctrina establecida en dicho caso. Expresa ahora el compañero Hernández Denton que "los autos y la prueba [del presente caso] revelan que los demandantes tuvieron una *participación efectiva y real* en los procesos de aprobación de las leyes cuestionadas, *cumpliéndose así* con las normas pautadas en *Silva* v. *Hernández Agosto*, supra". (Énfasis suplido.)

El problema con ello estriba que en *Silva* v. *Hernández Agosto*, ante, este Tribunal no estableció que los miembros de nuestras minorías parlamentarias tienen el derecho constitucional a tener una participación sustancial —o real y efectiva— en el proceso legislativo.

Establecimos clara y diáfanamente en *Silva* v. *Hernández Agosto*, ante, por el contrario, que dichas minorías, por imperativo constitucional, *tienen el derecho absoluto a participar plenamente en todas las etapas esenciales y cruciales de dicho proceso legislativo.*

Se trata, obviamente, de dos normas diferentes. Entendemos que la establecida en *Silva* v. *Hernández Agosto*, ante, hace escasamente once meses es la jurídicamente correcta.

## V

Finalmente, somos del criterio que si una mayoría de los integrantes del Tribunal entiende que debe abandonar la doctrina jurisprudencial sobre el derecho constitucional de las minorías parlamentarias a tener plena participación en el debate legislativo, según resuelto recientemente en *Silva* v. *Hernández Agosto*, ante, constituye un deber institucional el enfrentarse a sus válidos fundamentos en forma expresa.

En resumen, disentimos porque nos negamos a acompañar a una mayoría de los integrantes de este

Tribunal en las exequias del caso de *Silva* v. *Hernández Agosto,* ante.

## VI

Por las razones antes expresadas, revocaríamos la sentencia recurrida y devolveríamos el caso al foro de instancia para la continuación de procedimientos compatibles con lo aquí expuesto.

—O—

Voto disidente del Juez Asociado Señor Negrón García.

Debimos expedir el recurso de revisión. Es claramente errónea y contraria a los precedentes sentados en *Hernández Agosto* v. *Romero Barceló,* 112 D.P.R. 407 (1982), y *Silva* v. *Hernández Agosto,* 118 D.P.R. 45 (1986), la desestimación sumaria del ilustrado tribunal de instancia fundada en la carencia de legitimación activa (capacidad) de los demandantes Roberto Rexach Benítez, *et al.,* y en la afirmación de que la controversia no es "justiciable". Dicho dictamen les privó, ipso jure, de demostrar, en su oportunidad, si efectivamente el trámite legislativo seguido con relación a los estatutos impugnados infringió o no sustancialmente la doctrina establecida recientemente en *Silva* v. *Hernández Agosto,* supra, en cualesquiera de sus distintas vertientes.

El decreto de falta de capacidad y no justiciabilidad del tribunal de instancia le impidió entrar a considerar, evaluar y profundizar, en sus méritos, la validez y constitucionalidad del referido trámite legislativo. Nos preocupa, pues, ante ese fallo de carácter limitado y suscinto, el camino decisorio de este Foro apelativo que provee no ha lugar.

Lógicamente, en buena función adjudicativa, para arribar a la conclusión de que no se violó *Silva* v. *Hernández Agosto,* supra, este Tribunal, *sub silentio,* ha tenido que

reconocer la capacidad de Rexach Benítez *et al.* De ser así, lo procedente sería revocar la sentencia y devolver el caso al tribunal de origen para trámites ulteriores. Lamentablemente no hemos seguido esa ruta. En un ejercicio judicial que corresponde más bien al de jurisdicción original, no apelativa, se confirma lacónicamente al tribunal de instancia en virtud de un examen, también sumario, de los méritos del caso. Resulta, pues, prematuro y especulativo todo intento de sostener la negativa de este foro apelativo a intervenir, fundado en el razonamiento circular de que los autos evidencian que no hubo violación remediable a las normas vigentes sobre los derechos de las minorías parlamentarias.

La más completa deferencia del Poder Judicial hacia el Poder Legislativo no justifica que reclamos como el de autos, por su trascendental importancia, sean adjudicados mediante interpretaciones restrictivas, y sin que debidamente se diluciden en su fondo si realmente son justiciables. *Com. de la Mujer* v. *Srio. de Justicia*, 109 D.P.R. 715, 720–721 (1980).

La cuestión planteada en el recurso va a la raíz del proceso constitucional democrático apuntalado en una adecuada fiscalización de las mayorías por las minorías. Bajo *Silva* v. *Hernández Agosto*, supra, la consecución de ese fin implica la provisión de los instrumentos razonables y necesarios e igualdad de oportunidades en todas las etapas críticas del proceso legislativo.

Una nota cautelar: reconozcamos que la vigencia y no erosión de la doctrina del precedente (*stare decisis*), en su proyección prospectiva, inexorablemente depende de la estima valorativa que individual y colectivamente le imprimamos los Jueces a nuestras decisiones previas.

Revocaríamos la sentencia desestimatoria sumaria y devolveríamos el caso al tribunal de origen para trámites ulteriores compatibles con lo expuesto.

—O—

Voto particular emitido por el Juez Asociado Señor Hernández Denton.

Al examinar la controversia ante nos, reafirmamos que "es función ineludible de los tribunales interpretar la Constitución y velar que el espíritu democrático de esta Carta no se vulnere". *Silva* v. *Hernández Agosto*, 118 D.P.R. 45 (1986). Sin embargo, la efectividad y legitimidad de ese poder de revisión depende de que reconozcamos que tiene fronteras y debe ser utilizado con prudencia. Así lo expresamos claramente en *Silva* v. *Hernández Agosto*, supra, pág. 57:

> ... La teoría de la separación de poderes requiere que las facultades delegadas por el pueblo en la Carta Constitutiva se distribuyan entre las tres ramas. Su premisa es evitar la concentración de poderes en una sola. La relación entre los poderes del Gobierno debe ser dinámica y armoniosa. Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Su perdurabilidad requiere que cuando haya conflicto sobre el alcance de los poderes constitucionales de cualquiera de ellas, los tribunales intervengan con prudencia y deferencia para aclarar los contornos de la Constitución y facilitar la resolución de las diferencias.

Estoy de acuerdo con denegar el recurso de revisión incoado por los senadores del Partido Nuevo Progresista en el Senado de Puerto Rico por entender que los autos y la prueba documental revelan que los demandantes tuvieron una participación efectiva y real en los procesos de aprobación de las leyes cuestionadas, cumpliéndose así con las normas pautadas en *Silva* v. *Hernández Agosto*, supra.

I

La controversia ante nos se origina en una demanda de

sentencia declaratoria e *injunction* incoada por los senadores del Partido Nuevo Progresista con el propósito de que se declaren inconstitucionales varias leyes aprobadas en la Sesión Extraordinaria de la Asamblea Legislativa celebrada entre el 18 y el 24 de diciembre de 1986. Los demandantes alegaron que los proyectos "fueron sometidos a la consideración del Senado, sin haber sido citados los [s]enadores de la minoría a sesiones ejecutivas para discutir o considerar el informe [o] para someter cualquier informe disidente. Igualmente los [s]enadores de la minoría no tuvieron oportunidad de participar en las Conferencias Legislativas en los casos que hubo que dirimir dif[e]rencias entre lo aprobado por la Cámara y el Senado". Apéndice, pág. 4. Finalmente, alegaron que les fueron negadas copias de los informes y estudios relacionados con cada uno de los proyectos de ley.

Oportunamente los demandados sometieron una extensa y bien fundamentada moción de desestimación acompañada de abundante prueba documental. Ésta no fue contestada por los demandantes.

El tribunal desestimó la demanda. Sostuvo que la prueba documental "demuestra una participación real y efectiva de los [s]enadores demandantes en *todo* el proceso de las leyes impugnadas". (Énfasis suplido.) Apéndice, pág. 580. Concluyó que los senadores carecían de legitimación activa (*standing*) y que la controversia planteada "no era justiciable". Finalmente, advirtió que cualquier otra decisión constituiría una intromisión indebida del Poder Judicial en los procesos legislativos.

En el recurso ante nos, los demandantes cuestionan la procedencia de la desestimación. Examinado cuidadosamente el recurso, así como la prueba documental, estoy de acuerdo con la resolución del Tribunal porque de las circunstancias específicas de este caso no se desprende una

violación de la doctrina de *Silva* v. *Hernández Agosto*, supra, que amerite nuestra intervención.

## II

En primer lugar, procesalmente la desestimación de la demanda estuvo fundamentada en que no exponía una reclamación que justificara la concesión de un remedio. Evidentemente dicho foro actuó al amparo de la Regla 10.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y consideró materias no incluidas en la alegaciones impugnadas como si se tratara de una moción de sentencia sumaria. *Torres Ponce* v. *Jiménez*, 113 D.P.R. 58 (1982). Los senadores demandantes no cuestionaron en ningún momento la extensa prueba documental sometida por los demandados en su moción de desestimación. Tampoco solicitaron una vista ni sometieron escrito para replicar el estudio del derecho sometido por los demandados. Al igual que en el caso de *Torres Ponce* v. *Jiménez*, supra, pág. 62, "todas sus actuaciones reflejan que entendía[n] que la controversia era de derecho y no de hechos".

Después de esperar más de un mes por una oposición de los Senadores demandantes, el Tribunal a quo examinó el derecho aplicable y la prueba sometida. Fundamentado en una lectura del XXXIX Diario de Sesiones de la Asamblea Legislativa (Sesión Extraordinaria, Senado), Núm. 1, 1986, el Tribunal entendió que la prueba documental revelaba que no se violó la doctrina sobre los derechos de las minorías en el proceso legislativo. En ausencia de una controversia de hechos real y sustancial, procedía que la moción de desestimación se considerara como una sentencia sumaria y por lo tanto una adjudicación en los méritos. *Sucn. Meléndez* v. *DACO*, 112 D.P.R. 86, 89 (1982).

En segundo lugar, en vista de la tendencia actual hacia la liberalización de las normas que rigen las determinaciones de si una parte tiene legitimación activa (*standing*), *E.L.A.* v. *P.R. Tel. Co.*, 114 D.P.R. 394, 398 (1983), y nuestra decisión en *Hernández Agosto* v. *Romero Barceló*, 112 D.P.R. 407 (1982), procedía la consideración del recurso.

## III

Aclarados estos extremos, e independientemente de los complejos problemas de legitimación activa y justiciabilidad que plantea este caso, lo cierto es que un análisis meticuloso del Diario de Sesiones de la Asamblea Legislativa, *supra*, y la Certificación del Secretario del Senado revela que los senadores demandantes tuvieron una "participación real y efectiva" en todo el proceso de aprobación de las leyes cuestionadas. Contrario a lo ocurrido en *Silva* v. *Hernández Agosto*, supra, aquí los senadores de la minoría del Partido Nuevo Progresista (P.N.P.) y del Partido Independentista Puertorriqueño (P.I.P.) tenían representación en las comisiones camerales.

Mientras que en *Silva* v. *Hernández Agosto*, supra, se aprobó un reglamento para excluir a las minorías de las vistas, celebradas en sesión ejecutiva, en este caso el historial legislativo revela que asistieron regularmente a las audiencias. (Véase Apéndice I.) De la prueba documental también se desprende que los portavoces del P.N.P. (Hon. Roberto Rexach Benítez) y del P.I.P. (Hon. Rubén Berríos Martínez) fueron miembros de todas las comisiones senatoriales y que asistieron a las vistas públicas celebradas. De hecho, una lectura de la prueba demuestra que los portavoces de los dos partidos minoritarios aprovecharon en forma efectiva y destacada las vistas para interrogar a los deponentes y expresar sus puntos de vista sobre las leyes estudiadas. Por lo tanto, la situación en este caso es

diametralmente distinta a la que motivó nuestra intervención en *Silva* v. *Hernández Agosto*, supra.

Por otro lado, el Diario de Sesiones de la Asamblea Legislativa, *supra* (véase Apéndice III de la Moción de Desestimación) también revela que los senadores de las minorías no objetaron a la consideración de los informes de las comisiones senatoriales por parte del Senado en su sesión plenaria. De hecho, participaron en la Comisión de Reglas y Calendario y consintieron en remitir los informes al hemiciclo.([1])

Así lo informó al Senado el portavoz del Partido Popular Democrático, Hon. Gilberto Rivera Ortiz, el jueves 18 de diciembre de 1986:

*SR. RIVERA ORTIZ, G.:* Señor Presidente.

*SR. PRESIDENTE:* Señor Senador Rivera Ortiz.

*SR. RIVERA ORTIZ, G.:* Señor Presidente, la Comisión de Reglas y Calendarios se reunió y estamos listos para informar al señor Presidente si es que él así lo estima pertinente.

*SR. PRESIDENTE:* Adelante.

---

([1]) "Para preparar los calendarios de [Ó]rdenes Especiales del Día y los de Aprobación Final existe la Comisión de Reglas y Calendario. Esta Comisión se halla compuesta en cada Cámara por el Presidente, el Vicepresidente, los dirigentes parlamentarios de la mayoría y de las minorías y por el Presidente de la Comisión de Hacienda. La importancia de la Comisión de Reglas y Calendario es vital en el funcionamiento del Cuerpo Legislativo. Es ella la que dispone la legislación que va a ser discutida y cuándo será considerada.

"La Comisión de Reglas y Calendario es en donde se depositan los informes de todas las Comisiones. Allí, a voluntad de ella, esos informes pueden ser retenidos indefinidamente, o pasar en seguida a la consideración del Cuerpo legislativo. Usualmente preside la Comisión el dirigente de la mayoría, a su vez Vicepresidente de la misma. Teniendo el dirigente sobre sus hombros toda la responsabilidad de la labor en el hemiciclo, nada más lógico que esté en un sitio a donde se remite toda la legislación en trámite. Es la Comisión de Reglas y Calendario la única que puede reunirse mientras el Cuerpo a que pertenece está en sesión, sin que para ello tenga que solicitar permiso previo." N. Rigual, *El Poder Legislativo de Puerto Rico*, Río Piedras, Ed. U.P.R., 1961, pág. 100; véase, también, E. Bernier y J. A. Cuevas-Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, J.T.S., 1987, pág. 51.

*SR. RIVERA ORTIZ, G.:* Señor Presidente, para beneficio de todos los compañeros senadores, la Comisión de Reglas y Calendarios se reunió con el propósito de establecer un plan de trabajo para la Sesión Extraordinaria, a los fines de que cada cual pueda acoplar su tiempo adecuadamente y que pueda, a su vez, establecer un patrón de acción, no como decimos nosotros, sino a base de hora de puntualidad, que podamos descargar nuestra responsabilidad como Dios manda.

Vamos en el día de hoy, vamos a formar un Calendario de [Ó]rdenes Especiales, y luego tendremos una lectura de medidas que habrán de considerarse mañana a las nueve y media de la mañana (9:30 a.m.). Es decir, que aunque formemos un Calendario de [Ó]rdenes Especiales para el día de hoy, solamente lo hacemos con el propósito de proceder a leer las medidas que tenemos.

Esas medidas quedarán listas para empezar los trabajos a las nueve y media de la mañana (9:30 a.m.), mañana viernes. Y confiamos de que ya alrededor de la una de la tarde (1:00 p.m.), alrededor de eso, estaríamos ya preparados, habiéndose discutido las medidas.

Convinimos también de que las cinco (5) medidas que tienen que ver con impericia médica, que son cuatro (4) de ellas, vamos a incluir en el Calendario de [Ó]rdenes Especiales del día de hoy, habrán de verse en su totalidad, porque es el mismo tema. Es decir, que al estarnos expresando mañana con relación a las medidas, nos vamos a estar expresando con relación al grupo de medidas que tienen que ver todas ellas con impericia médica. De esta manera aceleramos el trabajo. Diario de Sesiones de la Asamblea Legislativa, *supra*, págs. 13–14.

Cuando los informes fueron sometidos al Senado los portavoces de las minorías también autorizaron su consideración. Por ejemplo, al someter el Informe de la Comisión de Gobierno sobre el P. del S. 939, el Presidente del Senado preguntó si había objeción y el Senador Rexach Benítez contestó en la negativa:

*SR. RIVERA ORTIZ, G.:* Señor Presidente, para proponer se releve la Comisión de Salud y Calidad Ambiental de rendir informes con relación al Proyecto del Senado 939.

*SR. REXACH BENÍTEZ:* No hay objeción.

*SR. PRESIDENTE:* No hay objeción. Así se acuerda.

*SR. RIVERA ORTIZ, G.:* Para proponer que el Proyecto del Senado 939, con el informe sometido por la Comisión de Gobierno Estatal sea incluido en el Calendario de [Ó]rdenes Especiales del día.

*SR. REXACH BENÍTEZ:* No hay objeción.

*SR. PRESIDENTE:* Si no hay objeción, así se acuerda. Diario de Sesiones de la Asamblea Legislativa, *supra*, pág. 15.

Tanto en la consideración de esta legislación como en las otras aprobadas durante la sesión, las minorías no objetaron a la lectura de los proyectos y los informes de las comisiones. Conforme a la práctica senatorial cada senador recibió simultáneamente copia de los informes y las enmiendas sugeridas y en ningún momento las minorías cuestionaron el procedimiento seguido por las comisiones.

Los portavoces de los tres partidos representados en la Asamblea Legislativa también acordaron las reglas para el debate de las medidas ante su consideración. Por ejemplo, en cuanto a las medidas de impericia médica se acordó lo siguiente:

*SR. RIVERA ORTIZ, G.:* Señor Presidente. Los Portavoces nos hemos reunido y hemos llegado al siguiente acuerdo, como regla de debate para estas cinco (5) medidas. Las cinco (5) medidas se van a co[g]er en bloque como parte del tema de impericia médica, sometido por el señor Gobernador. El compañero Rubén Berríos habrá de utilizar no más de quince (15) minutos. Me indica él que posiblemente no llegue tan lejos. El compañero, la representación PNP, habrán de tener un promedio de media hora, posiblemente menos de ello. Y la representación nuestra unos cuarenta y cinco minutos (45). Lo comunicamos de esa manera, señor Presidente para que es[e] sea el marco de referencia del tiempo a utilizarse para

fines de expresiones con relación a las cinco (5) medidas que están ante la consideración del Cuerpo.

*SR. VICEPRESIDENTE:* Quiere señalar, esos son los acuerdos, esas son las reglas. Quince (15) minutos para la Minoría independentista, media hora para la Minoría penepeísta y cuarenticinco (45) minutos para la Mayoría Parlamentaria.

*SR. REXACH BENÍTEZ:* Señor Presidente.

*SR. VICEPRESIDENTE:* Señor Senador.

*SR. REXACH BENÍTEZ:* Quiero aclarar algo. Los Senadores del Partido Nuevo Progresista sabemos que los Senadores de la Mayoría tienen un compromiso que deben cumplir a la una, más o menos, y estamos en la mejor disposición de permitirles a ustedes ese compromiso navideño. Ahora, le expliqué al distinguido compañero Gilberto Rivera Ortiz, que el acceder nosotros en este momento a esas reglas de debate, no implic[a] de parte nuestra una aceptación de este trámite, de este procedimiento de establecer reglas de debate sobre estos asuntos controversiales. Y obtuve de él un compromiso de caballeros con referencia a otras medidas, y al debate que habremos de tener sobre un tema bastante controversial que se ha estado ventilando públicamente. De manera que, quiero que conste eso en récord. Ha habido un acuerdo de caballeros que me ha permitido a mí darle mi voto favorable a las reglas de debate que ha explicado el compañero Rivera Ortiz.

*SR. RIVERA ORTIZ, G.:* Señor Presidente.

*SR. VICEPRESIDENTE:* La Presidencia quiere saber si esta[s] Regla[s] de Debate son product[o] del consenso, distinguidos compañeros. Independientemente [de] si hay algún tipo de compromiso para esta tarde.

*SR. RIVERA ORTIZ, G.:* Señor Presidente, a lo quiero referirme es precisamente a eso, los compromisos de caballeros no son compromisos procesales....

*SR. VICEPRESIDENTE:* Claro.

.        .        .        .        .        .        .        .

*SR. VICEPRESIDENTE:* La Presidencia va a disponer de dicha petición y dicha solicitud.

La Presidencia quiere hacer constar que, obviamente, los acuerdos que se han logrado [son] producto de un consenso entre los tres (3) Portavoces. Y que siempre aquí prevalece por encima de cualquier otra consideración, la aplicación correcta y justa de este Reglamento. Diario de Sesiones de la Asamblea Legislativa, *supra*, págs. 69–70.

Conforme a acuerdos análogos, los informes y los proyectos fueron extensamente debatidos en el hemiciclo. En sus intervenciones los senadores de las minorías tanto del P.N.P. como del P.I.P. analizaron los informes de la Rama Ejecutiva; recomendaron enmiendas a los proyectos y cuestionaron los propósitos y los alcances de las leyes ante su consideración. Aunque se acordaron reglas de debate con unos límites de tiempo para cada partido, la Presidencia del Senado autorizó extensiones cuando fue necesario.

Del récord legislativo también se desprende que los senadores minoritarios tuvieron acceso a los informes preparados por la Rama Ejecutiva y cuestionaron sus datos estadísticos y recomendaciones al contribuir en forma destacada. Debido a esta activa fiscalización de los senadores minoritarios, y al interés de la mayoría en que todos los senadores participaran efectivamente, el historial legislativo de estas leyes será de incalculable valor al analizar controversias sobre ellas.

Del Diario de Sesiones de la Asamblea Legislativa, *supra*, también se desprende que los problemas suscitados en el hemiciclo fueron parcialmente el resultado de la fecha en que fue convocada la Sesión Extraordinaria y el poco tiempo que tuvieron los legisladores para resolver todas las controversias. Apresurados por el compás del reloj, las exigencias sociales de la época navideña y agotados por las largas sesiones de los últimos días, los senadores discreparon sobre el uso acostumbrado de reuniones informales y del referéndum para resolver las diferencias surgidas entre el Senado y la Cámara de Representantes en dos de los

proyectos aprobados. Por constituir las actuaciones de los senadores en esos Comités de Conferencias "parte integral del proceso legislativo" y una actuación claramente legislativa, están cobijadas por la doctrina de inmunidad parlamentaria de la Constitución. *Silva* v. *Hernández Agosto,* supra. Su ámbito es amplio. Cubre toda actividad legislativa en el hemiciclo o en las comisiones, incluso "los procesos de deliberación, comunicación, investigación e información y actos necesarios para el desarrollo del proceso legislativo". *Vélez Ramírez* v. *Colberg Ramírez,* 117 D.P.R. 873 (1986); *Romero Barceló* v. *Hernández Agosto,* 115 D.P.R. 368 (1984). Aunque esta inmunidad no es absoluta, *Santa Aponte* v. *Srio. del Senado,* 105 D.P.R. 750, 764 (1977), en este caso nuestra intervención requeriría una investigación sobre deliberaciones y comunicaciones protegidas por esa disposición constitucional.

Finalmente, los senadores de los partidos minoritarios tuvieron la oportunidad de sugerir enmiendas y votar sobre cada una de las leyes. El historial legislativo revela que los senadores demandantes se opusieron a todas las leyes mediante su voto en contra o abstención. Concluida la sesión recurrieron cuatro meses después a los tribunales para solicitar que las leyes fueran declaradas inconstitucionales.

Por su parte, el Senador Berríos Martínez votó afirmativamente en la Ley Especial de Sustento de Menores y en contra de la mayoría de las medidas restantes. Sin embargo, en el hemiciclo no se solidarizó con los planteamientos del Senador Rexach Benítez. Tampoco se unió a la demanda de los Senadores del P.N.P. ni incoó acción legal para impugnar la aprobación de las leyes.

En vista de la prueba no controvertida en torno a la participación de las minorías en el hemiciclo del Senado, procede que nos abstengamos de intervenir en este caso. De lo contrario, permitiríamos que un sector de las minorías legislativas mude la arena política a los tribunales. La

Sesión Extraordinaria concluyó el 25 de diciembre de 1986. No debe permitirse mediante un pleito infundado que los tribunales se conviertan en un foro para la continuación de los debates que concluyeron ese día.

En síntesis, en este caso ante la ausencia clara de una controversia de hechos *real y sustancial*, es inevitable la conclusión de que procedía una determinación sumaria de que no hubo una violación de la doctrina pautada en *Silva v. Hernández Agosto*, supra, que amerite nuestra intervención. Como la revisión se da contra la sentencia y no en sus fundamentos, proveería un no ha lugar al recurso instado.