José Córdova Iturregui y otros, peticionarios, *v.* Cámara de Representantes del Estado Libre Asociado de Puerto Rico y otros, recurrida; Raquel del Valle y otros, peticionarios, *v.* Francisco González Rodríguez y otros, recurridos; Colegio de Abogados de Puerto Rico, amicus curiae.

*Números:* CC-2007-350
CC-2007-361

*Resueltos:* 29 de junio de 2007

*José A. Rodríguez Jiménez*, abogado de José Córdova Iturregui y otros, parte peticionaria; *Héctor M. Collazo Maldonado*, del *Bufete Collazo & Collazo*, y *Pedro J. Valera Hernández*, abogados de Raquel del Valle y otros, parte peticionaria; *Ángel J. Vargas Carcaña* y *Kevin Miguel Rivera Medina*, de la Oficina de Asesores Legales y Asuntos Federales del Presidente del Senado de Puerto Rico; *Richard W. Markus*, director de la Oficina de Asesores Legales; *Carlos E. Pérez Acosta*, asesor del Presidente del Senado, y *Manuel D. Herrero*, del *Bufete Herrero & Herrero*, abogados de la parte recurrida; *Margarita Nolasco Santiago, Carlos A. Pagán González, Pedro Rosselló González, José Emilio González, Lorna Soto* y *Daniel Muñiz Cortés*, senadores electos por el Partido Nuevo Progresista, en comparecencia especial; *Marcos A. Ramírez Lavandero* y *Luis González Castañer*, abogados del Colegio de Abogados de Puerto Rico, *amicus curiae*.

Opinión disidente emitida por el JUEZ ASOCIADO SEÑOR REBO-
LLO LÓPEZ.

Una de las características del ejercicio de la profesión
legal que más le llama la atención al ciudadano común y
corriente —y que más difícil le resulta entender— es que
las dos posiciones contrarias de, prácticamente, todas las
controversias legales que a diario se plantean ante los tri-
bunales de justicia pueden ser objeto, *ambas*, de funda-
mentada argumentación y resolución; situación que, en-
tendiblemente, resulta sumamente difícil de aceptar para
el ciudadano lego en estas cuestiones y que, posiblemente,
sea una de las principales razones por las cuales la profe-
sión legal no goza de la confianza y estima que debería de
tener entre la ciudadanía.

Hay ocasiones, sin embargo, en que no obstante los fun-
damentados argumentos *aparentes* que un tribunal utiliza
en apoyo del resultado que promulga, un análisis *somero*
de la decisión judicial emitida, y de los argumentos esbo-
zados en ésta, es todo lo que se necesita para que una per-
sona pueda percatarse de lo errado del proceder judicial en
ese caso en particular. *Esa, precisamente, es la situación en
el recurso hoy ante nuestra consideración.* El error come-
tido por la mayoría de los integrantes del Tribunal en la
decisión que emite en el presente caso es tan abismal que
"resalta a la vista y hiere la retina".[1]

La decisión mayoritaria emitida en el recurso de epí-
grafe es errónea, lamentable y —porqué no decirlo— una
acomodaticia. *Así no se le hace justicia a este pueblo.*

Los ciudadanos de este bendito país tienen el derecho a
que, si les asiste la razón, este Tribunal así lo determine y
decrete, *independientemente de cuántas veces haya que fa-
llar o decidirle en contra a determinado sector de nuestra
sociedad.*

No podemos avalar esa clase de conducta judicial y, mu-
cho menos, permanecer callados. Nuestro norte siempre

---

[1] *In re Roldán González*, 113 D.P.R. 238, 242 (1982).

tiene que ser, como árbitros de las controversias que afectan a nuestra ciudadanía, *darle la razón al que la tenga sin tomar en consideración que a algunas personas, o funcionarios, les pueda disgustar nuestras decisiones, esto es, independientemente de las consecuencias que éstas nos puedan acarrear. No ejercemos nuestro ministerio dentro de un concurso de popularidad.*

Resolver, como lo hace la Mayoría, que la Ley Núm. 477 de 23 de septiembre de 2004, aprobada por la Decimocuarta Asamblea Legislativa de Puerto Rico, no tiene consecuencia legal alguna, por lo que no obliga a la actual Asamblea Legislativa —en específico, a la Cámara de Representantes— a actuar conforme claramente establece la mencionada Ley Núm. 477 *significa, llana y sencillamente, que dicha acción legislativa fue una "tomadura de pelo a nuestra ciudadanía"; es decir, que fue un ejercicio de futilidad llevar a cabo el referéndum celebrado el 10 de junio de 2005, y, peor aún, un gasto de dinero superfluo y hasta, posiblemente, ilegal.*

## I

El Art. VII de la Constitución del Estado Libre Asociado de Puerto Rico establece que:

> Sec. 1—La Asamblea Legislativa podrá proponer enmiendas a esta Constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes del número total de los miembros de que se compone cada cámara. Toda proposición de enmienda se someterá a los electores capacitados en referéndum especial, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no menos de tres cuartas partes del número total de los miembros de que se compone cada cámara disponer que el referéndum se celebre al mismo tiempo que la elección general siguiente. Cada proposición de enmienda deberá votarse separadamente y en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum. Toda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular. Aprobada una pro-

posición de enmienda, deberá publicarse con tres meses de antelación, por lo menos, a la fecha del referéndum. L.P.R.A., Tomo 1, ed. 1999, pág. 423.

No hay que ser ni muy inteligente ni muy perspicaz para correctamente poder concluir que, por mandato constitucional, todo *intento* de enmendar nuestra Constitución —aun cuando inicialmente sea recomendado, digamos, a manera de ejemplo, por el Gobernador de Puerto Rico— se tiene que *originar* en la Asamblea Legislativa.

Eso, *precisamente*, fue lo que sucedió en el presente caso en el 2004. La *acción* de enmendar la Constitución —respecto a la existencia de una sola cámara legislativa— *se originó en la Asamblea Legislativa.*

Lo que sucede es que la Legislatura, teniendo en dicho momento el pleno poder o facultad para aprobar, mediante resolución conjunta o una ley, la celebración inmediata y directa de un referéndum —especificando, desde un principio, las enmiendas específicas a la Constitución, esto es, y a manera de ejemplo, de cuántos miembros se compondría dicha unicámara, los distritos electorales que éstos miembros representarán, entre otros— *determinó dividir este proceso de enmienda en dos etapas o partes*; procedimiento que es completamente legal porque "el que puede lo más, puede lo menos". *Pueblo v. Valentín*, 135 D.P.R. 245, 251 (1994).

La Asamblea Legislativa —actuando en forma cautelosa— determinó mediante una *ley* que en la *primera* de esas etapas la ciudadanía votaría sobre si favorecía, o no, la unicameralidad. Estableció —*de forma clara y específica*— mediante la citada Ley Núm. 477, en lo pertinente, que un *voto a favor* de la unicameralidad "significara un *mandato* a la Asamblea Legislativa para *que se celebre un referéndum* el nueve (9) de julio de 2007 con el fin de proponer al electorado que se enmiende la Constitución del Estado Libre Asociado de Puerto Rico, de forma tal que a partir del 2 de enero de 2009 la Asamblea Legislativa de Puerto Rico esté constituida bajo una sola cámara". (Énfasis suplido.) 16 L.P.R.A. sec. 971a.

La *única* interpretación, *lógica y razonable*, del lenguaje de la ley citada es a los efectos de que, celebrada la consulta el 10 de junio de 2005 y habiendo resultado favorecida por el pueblo la unicameralidad, la actual Asamblea Legislativa *obliga* a pasar a la *segunda etapa* establecida por la Ley Núm. 477.

Dicho de otra manera, ya *no* le corresponde a la presente Asamblea Legislativa ejercer su discreción sobre si puede celebrar, o no, el referéndum sobre la unicameralidad ya que, repetimos, está *obligada* a ello. Sobre lo que sí tiene discreción —en esta *segunda* etapa— *es sobre la decisión de qué enmienda específica a la Constitución le van a proponer al pueblo*; votación que tiene que ser aprobada por dos terceras partes de sus miembros.

*¿Por qué están así obligados?* Llana y sencillamente porque ellos representan al pueblo, el pueblo ya se expresó, *favoreció* la unicameralidad, decidió que *sí* quieren que se celebre el referéndum, *y el pueblo es soberano*. Ni más ni menos.

En resumen, la actual Asamblea Legislativa *no* puede en esta etapa pasar juicio sobre la deseabilidad de celebrar un referéndum sobre la unicameralidad. *Esa decisión ya la tomó el pueblo*. En consecuencia, la Legislatura *no* goza de discreción para negarse a ello. Lo *único* que tiene que decidir la actual Asamblea Legislativa es determinar el lenguaje de la enmienda a la Constitución que se le va a someter al pueblo.

Aquí *no* se trata, como se nos quiere hacer creer, de que una Asamblea Legislativa no puede obligar a otra. Ese argumento *podría* utilizarse bajo *otra* situación de hechos y circunstancias en las cuales no exista un *mandato expreso* del pueblo de Puerto Rico. *De lo que aquí realmente se trata es que la actual Asamblea Legislativa no puede ignorar el mandato que este pueblo emitió el 10 de junio de 2005.* Debe recordarse que el poder que posee la Asamblea Legislativa se lo concede, *o emana de*, el Pueblo de Puerto Rico, *quien es el soberano*. La Asamblea Legislativa *no* es autó-

noma *ni* omnipotente. *Ésta depende de los mandatos y poderes que le concede el pueblo.*

Por otro lado, debe mantenerse presente que los componentes de la actual Asamblea Legislativa, al tomar posesión de sus cargos, juraron *defender y obedecer* la Constitución y las leyes del Estado Libre Asociado de Puerto Rico; es por ello que vienen obligados a *obedecer* las disposiciones de la citada Ley Núm. 477 de 2004, *la aplicación de cuya ley culminó en un mandato del pueblo a esa Legislatura.*

Resolver lo contrario —como lo hace la mayoría de los integrantes del Tribunal, amparándose en argumentos erróneos y en doctrinas que no son aplicables a los hechos del presente caso— *es resolver que los miembros de una Asamblea Legislativa en particular son "más soberanos" que el Pueblo de Puerto Rico, lo cual resulta ser insostenible y absurdo.*

## II

Es norma reiterada que la jurisdicción de nuestros tribunales se limita a aquellas instancias en que pueda precisarse la existencia de un caso o controversia, pues "los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas". *E.L.A. v. Aguayo*, 80 D.P.R. 552, 558–559 (1958). Es por ello que en función de la doctrina de separación de poderes y dentro de nuestro esquema de autolimitación judicial, hemos establecido que la Rama Judicial no intervendrá en asuntos en que esté involucrada una "cuestión política".

"La doctrina de cuestión política plantea, en esencia, que hay asuntos que no son susceptibles de determinación judicial porque su resolución corresponde a las otras ramas de gobierno —ejecutivo y legislativo— y no al poder

judicial." *Noriega v. Hernández Colón*, 135 D.P.R. 406, 422 (1994). *No obstante*, ante distintos reclamos de cuestión política atendidos en el pasado, este Tribunal ha expresado que dicha doctrina *no* priva a los tribunales de su deber de interpretar la Constitución y de determinar si los actos de una rama de gobierno exceden su autoridad constitucional. Véanse: *Noriega v. Hernández Colón*, ante; *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977). A esos efectos claramente hemos expresado que la "Constitución les confiere determinadas facultades al Poder Legislativo y al Ejecutivo, *pero la definición de sus contornos y la determinación de la validez de su ejercicio son asuntos cuidadosamente reservados a los tribunales*". Véase *Santa Aponte v. Srio. del Senado*, ante, pág. 759.([2])

Con dicho principio como norte, en *Santa Aponte v. Srio. del Senado*, ante, *asumimos jurisdicción y dispusimos* que el Senado —aun cuando goza del poder constitucional exclusivo para decidir si ordena un recuento de votos respecto a un senador cuya elección se ha cuestionado— viene en la *obligación de permitir* que el senador electo disfrute de todas las prerrogativas de su cargo hasta tanto culmine el proceso de recuento de votos y se determine finalmente quién obtuvo la mayoría de éstos.

Por otro lado, en *Silva v. Hernández Agosto*, ante, luego de resolver que la doctrina de cuestión política *no* era aplicable, *intervinimos en el proceso de reglamentación interna de la Asamblea Legislativa*, y resolvimos que cierta regla que versaba sobre los procesos investigativos y deliberativos de la Comisión de lo Jurídico del Senado *infringía* los derechos constitucionales de los representantes de las minorías.

Por último, en *Noriega v. Hernández Colón*, ante, pág.

---

([2]) De hecho, que conozcamos, este Tribunal *nunca* ha aplicado la doctrina de cuestión política a un caso ante su consideración. Esta sería la primera vez que se hiciera en la historia jurídica de este país.

426, citando con aprobación los casos previamente señalados y luego de *rechazar* la aplicación de la doctrina de cuestión política, procedimos a *"delinear los contornos* que la Constitución de Puerto Rico le confirió a las Ramas Legislativas y Ejecutiva *con respecto a los poderes de cada una de hacer y de poner en vigor las leyes"*. (Énfasis suplido.)

Dicho de otra manera, en los casos citados y no obstante la supuesta "existencia" de la doctrina de cuestión política en nuestra jurisdicción, *intervinimos directamente* con poderes y reglamentos de la Asamblea Legislativa; *procedimos a delinear* procedimientos a seguir por ésta; a *anular reglamentos internos* promulgados por la Legislatura, y a *precisarle los parámetros* de sus poderes.

*Cabe preguntarse: ¿qué nos impide ahora ordenarle a la Asamblea Legislativa a que cumpla con las claras disposiciones de una ley y, sobre todo, con el mandato claro y específico del Pueblo de Puerto Rico?*

## III

Analizadas las circunstancias de este caso y la jurisprudencia citada, *no* hay dudas de que la doctrina de cuestión política —*la cual, repetimos, nunca hemos aplicado*— no constituye impedimento para que este Tribunal atienda y se exprese sobre la controversia aquí planteada.

Coincidimos con los peticionarios respecto a que la Asamblea Legislativa, *al negarse a respetar el mandato del pueblo se colocó al margen de la Constitución y que este Tribunal, como máximo interprete de la Constitución, viene obligado a vindicar los derechos del pueblo mediante la correcta y única interpretación de las disposiciones jurídicas en controversia*; de lo contrario, estaríamos *abdicando nuestra función ineludible* de interpretar "la Constitución y [de] velar que el espíritu y el esquema democrático de esta Carta no se vulnere". *Silva v. Hernández Agosto*, ante, pág. 57.

Por entender que así actúa la Mayoría, es que disentimos.